Elizabeth B. DUNCAN, et al.

v.

David B. POYTHRESS, et al.

Civ. A. No. 81–199 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 28, 1981.

**330**

Kathleen Kessler, William F. Rucker, William B. Hollberg, Atlanta, Ga., for plaintiffs.

Arthur K. Bolton, Atty. Gen., Michael J. Bowers, Senior Asst. Atty. Gen., Atlanta, Ga., for defendants.

ORDER

RICHARD C. FREEMAN, District Judge.

Plaintiffs bring this civil rights action, 42 U.S.C. § 1983, alleging violations of the equal protection and due process clauses of the Fourteenth Amendment of the United States Constitution, in that they were denied the right to vote for Associate Justice of the Supreme Court of Georgia in a special election. They contend that defendants Governor George D. Busbee and former Associate Justice Jesse G. Bowles of the Supreme Court of Georgia manipulated the events surrounding Justice Bowles' resignation from the court to permit the Governor to appoint Bowles' successor. Plaintiffs also assert a pendant state claim of fraud. This court has jurisdiction pursuant to 28 U.S.C. § 1343.

Plaintiffs seek both declaratory and injunctive relief and damages. Plaintiffs ask that this court order that a special election be held to fill Justice Bowles' unexpired term on the Supreme Court, and that Justice Gregory, currently serving Justice Bowles' term, be enjoined from further serving that term and from running as an incumbent in the special election. Plaintiffs seek one million dollars in exemplary damages from defendants Bowles and Busbee to be paid into the state treasury to help finance the election. In addition, plaintiffs ask for one dollar each in compensatory damages for violation of their constitutional rights, and for attorney's fees and costs.

On February 26, 1981, the court accelerated trial on the merits with plaintiff's request for preliminary injunctive relief, and the case was tried to the court on March 26 and 27, 1981. Rule 65(a)(2), Fed.R.Civ.P. The following order shall serve as the court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.P.

## I. STATEMENT OF THE FACTS

The Constitution of the State of Georgia provides for the popular election of state Supreme Court justices to six-year terms. If a vacancy occurs during an unexpired term,[1] however, the Governor appoints a successor.

> The Justices . . . shall hold their offices for six years, and until their successors are qualified. They shall be elected by the people at the same time and the same manner as members of the General Assembly. In case of any vacancy which causes an unexpired term, the same shall be filled by executive appointment, and the person appointed by the Governor shall hold his office until the next regular election, and until his successor for the balance of the unexpired term shall have been elected and qualified. The returns of such elections shall be made to the Secretary of State, who shall certify the result to the Governor, and commission shall issue accordingly.

Ga.Code § 2–3103. The election law of Georgia also provides that whenever a person elected to a public office withdraws before taking office, the vacancy is to be filled by a special election called by the Secretary of State.

> Whenever any primary or election shall fail to fill a particular nomination or office and such failure cannot be cured by a run-off primary or election, or whenever any person elected to public office shall die or withdraw prior to taking office, or whenever any person elected to public office shall fail validly to take that office, then the authority, with whom the candidates for such nomination or office filed their notice of candidacy, shall thereupon call a special primary or election to fill such position.

Ga.Code § 34–1514. The plaintiffs predicate their constitutional claims on these provisions, contending that a special election should have been called to elect a new justice to the court after November 20, 1980, when Justice Bowles resigned his seat effective December 31, 1980. The facts from which this claim arose are set out in full below.

Plaintiffs are registered voters in Fulton County and DeKalb County, Georgia. Defendants are George D. Busbee, Governor of the State of Georgia; Jesse G. Bowles, former Associate Justice of the Supreme Court of Georgia; Hardy Gregory, Jr., Associate Justice of the Supreme Court of Georgia; and David B. Poythress, Secretary of State, State of Georgia. Defendants Gregory and Poythress were joined as defendants in this action solely for the purpose of affording plaintiffs complete relief.

On April 25, 1977, Jesse G. Bowles was appointed by Governor Busbee as an Associate Justice of the Supreme Court of Georgia. Justice Bowles was subsequently elected, on November 7, 1978, to fill a term of office as an Associate Justice until December 31, 1980. The justice encountered personal problems during his tenure on the court, however. Family arrangements required that the justice commute from Cuthbert in southern Georgia to Atlanta on a weekly basis, and the necessity and expense of supporting two homes caused financial

---

1. Under Georgia law, a vacancy may occur by seven different means.

    All offices in the State shall be vacated—
    1. Death
    By the death of the incumbent.
    2. Resignation
    By resignation, when accepted.
    3. Judgment
    By decision of a competent tribunal declaring the office vacant.
    4. Incapacity
    By voluntary act or misfortune of the incumbent, whereby he is placed in any of the specified conditions of ineligibility to office, which shall operate from the time the fact is ascertained and declared by the proper tribunal.
    5. Nonresidence
    By the incumbent ceasing to be a resident of the State, or of the county, circuit, or district for which he was elected. . . .
    6. Failing to obtain commission or give bond
    By failing to apply for and obtain commissions or certificates, or by failing to qualify or give bond, or both, within the time prescribed by the laws and Constitution.
    7. Abandonment of office
    By abandoning the office and ceasing to perform its duties, or either.

    Ga.Code, § 89–501.

and marital strain. The problems became so acute that, in October 1979, the justice met with Governor Busbee to discuss the possibility of resigning from the court. The Governor urged Justice Bowles to continue on the court at that time, and the justice agreed.

On June 11, 1980, Justice Bowles qualified to run in the Democratic primary for election to a full term on the court. Unfortunately, the justice's personal situation continued to deteriorate throughout 1980, and he continued seriously to consider resigning from the court. On August 5, 1980, Justice Bowles was nominated in the Democratic Party primary for election to the office of Associate Justice of the Supreme Court of Georgia.

In early August 1980, Bowles attempted to discuss the potential effects of his withdrawal from the race with someone at the Democratic Party headquarters. Receiving no useful information there, Bowles sought out Charles Tidwell, the Governor's executive counsel in charge of judicial nominations, to explore the statutory provision, party rules, and prior practices regarding resignations from the court. The two men discussed the mechanics by which a substitute nominee would be chosen in the time periods preceding the general election as specified by statute. See Ga.Code § 34–1003. Tidwell told Bowles that the Governor would have some influence in the selection process, but would not be able to control it. Bowles asked Tidwell to review the election laws to determine the effect of his resignation.

In September 1980, Justice Bowles informed Tidwell that he was intending to resign. Bowles, Tidwell, and Busbee met on September 24 to discuss the justice's resignation. The three men discussed the possible procedural and political ramifications of various resignation dates. The three men testified that they were not aware of and did not discuss at that time the provision in the Georgia Code providing for a special election when an official elected at a general election withdraws before taking office. Ga.Code § 34–1514. Justice Bowles left the meeting with the Governor and Mr. Tidwell stating that he would not resign at that time.

Justice Bowles was reelected to office on November 4, 1980. Nevertheless, he continued to deliberate as to whether, when, and how he should resign. Charles Tidwell knew that the Judicial Nominating Commission [2] (Commission), which screens applicants for appointment to the state court benches, would be meeting on December 11 and 12, 1980, to discuss candidates for appointment to the soon-to-be-vacant seat of George T. Smith on the Georgia Court of Appeals.[3] The Commission met infrequently, only at the Governor's request, and needed at least three weeks to distribute notices of a particular vacancy so that applicants would have a chance to respond and be considered at the next meeting. Aware of the Commission's time schedule and hoping to avoid duplicative effort by the Commission, Tidwell called Justice Bowles in an attempt to coordinate the Smith and Bowles resignations. Mr. Tidwell informed the justice that the last possible day to resign and trigger the nominating process for his seat would be November 20, 1980.

Justice Bowles wrote a letter of resignation dated November 20, 1980, and delivered it to Mr. Tidwell on that date. The letter did not include an effective date, however. The two men discussed the omission, Mr. Tidwell advising the justice that the effective date was his decision. Justice Bowles then included the words "effective December 31, 1980" on the letter. Plain-

---

**2.** The Judicial Nominating Commission is an independent commission created by Executive Order, responsible for soliciting and screening applicants for appointment to vacancies in the state courts. Defendants' Exhibits 1–5. The Commission consists of five *ex officio* members of the State Bar of Georgia, and five members appointed by the Governor from the public at large. The deliberations and nominations of the Commission are confidential.

**3.** George T. Smith ran for election to the Georgia Supreme Court while a member of the Georgia Court of Appeals, and was elected on November 4, 1980.

tiffs' Exhibit A. Mr. Tidwell informed the Commission that day to begin seeking and screening candidates for Justice Bowles' seat. The resignation was accepted by Governor Busbee by letter dated November 21, 1980.[4] Plaintiffs' Exhibit C.

Sometime prior to November 21, 1980, Justice Bowles had asked Charles Webb, administrative aide to the Chief Justice, to prepare a press release on his resignation, but to hold the release until notified by Justice Bowles. The justice wanted a release prepared to be sent to county weekly publications around Cuthbert, Georgia, where he planned to return to practice law. The press release was prepared on Supreme Court stationary and stated that Justice Bowles "has resigned to return to the private practice of law at Cuthbert," and that he had written Governor Busbee asking "that his resignation be made effective as of Dec. 31." Plaintiffs' Exhibit M. The story of the resignation had by this time been reported in the press, and Mr. Webb called the justice to suggest that the statement be released. The justice agreed. Mr. Webb read him the text of the statement over the phone, and it was dated and distributed on November 21, 1980.[5]

Chief Justice Undercofler also released a short statement on November 21, 1980, having been told by Justice Bowles the previous afternoon that he was leaving the court. Justice Undercofler stated that he "regrets that Justice Jesse G. Bowles has decided to leave the Supreme Court of Georgia." Plaintiffs' Exhibit N. Justice Undercofler testified that he fully expected Justice Bowles to take the oath of office on December 15, 1980, for his new term beginning in 1981, but conceded that he had no factual basis for his belief.

On November 24, 1980, Charles Tidwell met with Governor Busbee and told him that he was coordinating Justice Bowles'

resignation with the Commission's schedule. The two men discussed the recent news reports on the justice's resignation and reviewed the special election law. Both were concerned about the expense of holding a special election and the likelihood of low voter turnout so soon after a general election.

Sometime after this meeting, Judge Quillian of the Georgia Court of Appeals called the Governor to request a speedy appointment of a replacement for the departing Judge George T. Smith. The Governor told him that he intended to wait and make a double appointment, simultaneously replacing both Judge Smith and Justice Bowles.

The plaintiffs began their quest for a special election shortly after reading in the newspapers of Justice Bowles' resignation from the court on November 20, 1980. Aware of the provision for special elections in the Georgia Code, and concerned that all appellate judges in the state currently serving were appointed rather than elected to their initial terms of office, plaintiffs wrote and hand delivered to Secretary Poythress on December 3, 1980, a letter requesting a special election. Plaintiffs' Exhibits E, X.

On December 4, 1980, Governor Busbee held a press conference. When asked at the conference if he would support a special election for Supreme Court justice, the Governor stated he would not on the ground that it would cost the state over one million dollars and probably result in a small voter turnout. That same day, one of the plaintiffs visited Justice Bowles at the Supreme Court to inquire of him whether he had resigned his office. The justice refused to answer the plaintiff's questions, however, telling her he would respond only through the "proper authorities" or "channels." On December 9, 1980, plaintiffs again wrote to Secretary Poythress because they had not yet received a response to their initial in-

---

4. Ga.Code § 89–504 provides:
   The resignations of Senators and Representatives in Congress, members of the General Assembly, and of all officers whose commissions issue from the office of Secretary of State, or the Executive Department, and

whose places may be supplied by executive appointment, shall be made to the Governor.

5. Justice Bowles testified he did not read the statement before it was released. Otherwise, he would have deleted the final paragraph relating to his marriage.

quiry concerning a special election. Plaintiffs' Exhibit G.

On December 15, 1980, plaintiffs met with Mr. Poythress who gave them, in writing, a response to their request for an election. The Secretary stated that he had received a letter dated December 5, 1980, which he had solicited from Charles Tidwell, the Governor's executive counsel, explaining that Justice Bowles' resignation effective December 31, 1980, was intended to apply only to his currently held term of office which would expire as a matter of law on December 31, 1980. Mr. Tidwell wrote to the Secretary that

> [w]hile it is only private supposition upon my part at this time, I would not be surprised if sometime after Justice Bowles assumes his newly elected office . . . he should resign. In anticipation of this eventuality, we have requested the Judicial Nominating Commission to initiate their screening processes of candidates to fill by executive appointment any vacancy which might occur.

Plaintiffs' Exhibit F. As a result of this letter, Secretary Poythress told the plaintiffs that "Justice Bowles' resignation, and the Governor's acceptance thereof, were intended by both men to relate to Justice Bowles' presently held commission which expires December 31, 1980." In addition, he stated that Justice Bowles had "verbally confirmed to [him] that such was his intention and that he does intend to enter upon the duties of the new term of office beginning on January 1, 1981." Plaintiffs' Exhibit H. Therefore, a special election would not be required. However, the defendants did not issue a public statement to correct the news reports that Justice Bowles was resigning from the Supreme Court as of December 31, 1980. Justice Bowles took the oath of office for his new term on December 15, 1980.

On the same day, December 15, the plaintiffs visited Mr. A. G. Cleveland, the head of the Governor's Judicial Nominating Commission. Mr. Cleveland told the plaintiffs that the Commission was working on a list of nominees to give to Governor Busbee as potential candidates for appointment to both Justice Bowles' seat on the Supreme Court and Judge Smith's seat on the Court of Appeals. On December 16, the plaintiffs read in the newspapers that Justice Bowles had, the day before, taken the oath of office for his new term beginning January 1, 1981. Believing that Justice Bowles intended to serve his new term, the plaintiffs abandoned their campaign for a special election.

At a meeting on December 17, Mr. Tidwell, who had picked up the list of nominees from the Commission the previous day, told the Governor that he could not fill Justice Bowles' seat until Bowles resigned his new commission sometime after January 1, 1981. The Governor interviewed candidates for both positions on December 18, and appointed Judge Smith's replacement, who was sworn in January 5, 1981.

According to his testimony, Justice Bowles continued actively to consider leaving the court throughout this period, but it was not until all hope of resolution of his personal problems had dissolved over the Christmas holidays that he decided on January 2, 1981 that he would make a final decision on January 5, his first day in his chambers in the new term. On the morning of January 5, Justice Bowles returned to the courthouse and called Hardy Gregory, Jr. to discuss Gregory's appointment and whether the new justice would like to interview Justice Bowles' staff or retain his parking place at the court building.

Around noon on January 5, Justice Bowles sent a letter of resignation to the Governor. The resignation was accepted in writing by the Governor on the same day. Plaintiff's Exhibits J, K. On January 6, the plaintiffs read in the newspapers that Justice Bowles had resigned his office effective immediately, and that the Governor had selected his successor. Governor Busbee administered the oath of office to Associate Justice Hardy Gregory, Jr. on January 8, 1981. On the following day the plaintiffs delivered to Secretary of State Poythress another letter demanding a special election. The plaintiffs received no response, and approximately three weeks later filed this suit.

In sum, the facts of this case are not genuinely disputed by the parties. As to the motivations which hold these facts together in a pattern, however, the parties have very different views. Plaintiffs paint a picture of political chicanery and intrigue, in which defendants Busbee and Bowles purposefully orchestrated their actions to defraud plaintiffs and deprive them of their right to vote in a special election. On the other hand, the defendants' contention that because Justice Bowles intended to resign only for one day—December 31, 1980, the day on which his term naturally expired[6] —a vacancy on the court was never created and the need for a special election never arose, is at best contrived. Although we find that the truth is somewhere in between, we believe that the plaintiffs' constitutional rights have been violated, and that they are entitled, at least partially, to the relief they seek.

## II. PRELIMINARY ISSUES

### A. *Abstention*

Defendants contend that the court should abstain in this matter. The basis of their argument is that a definitive state court interpretation of the special election statute would resolve the constitutional question presented in this case. Defendants claim that a special election is required only when an elected candidate "withdraws" before taking office. Ga.Code § 34–1514. The question of whether Justice Bowles' November 20, 1980 "resignation" constituted a "withdrawal" is, therefore, a question of statutory construction, the resolution of which would obviate the constitutional issues.

The Supreme Court in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), established three factors for the district court to consider in deciding whether to abstain:

(1) whether the disposition of a question of state law involved in the case can eliminate or narrow the scope of the federal constitutional issues; (2) whether the state law question presents difficult, obscure or unclear issues of state law; and (3) whether a federal decision could later conflict with subsequent state court resolutions concerning the same regulatory program or scheme....

*High Ol' Times, Inc. v. Busbee,* 621 F.2d 135, 139 (5th Cir. 1980). "[A]bstention cannot be ordered," however, "simply to give state courts the first opportunity to vindicate the federal claim." *Zwickler v. Koota,* 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967).

We do not find this to be an appropriate case for abstention. Plaintiffs claim that they have been denied the right to vote. They do not challenge the state statute governing special elections, but contend only that it has been applied in an unconstitutional manner. A state court interpretation of the special election law, which is clear on its face, would not substantially alter the federal claim presented to this court for resolution. It would defeat the purposes of the Civil Rights Act if the "assertion of a federal claim in federal court must await an attempt to vindicate the same claim in state court." *McNeese v. Board of Education,* 373 U.S. 668, 672, 83 S.Ct. 1433, 1435, 10 L.Ed.2d 622 (1963). *See Smith v. Cherry,* 489 F.2d 1098 (7th Cir. 1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). This court will not abstain from considering the merits of plaintiffs' claim.

### B. *Mandamus*

Defendants also assert that plaintiffs should have sought mandamus relief in state court against Secretary Poythress prior to filing this federal action, and therefore have no right to a special election at this time. In Georgia, mandamus lies against a public officer to require the performance of a duty to which the plaintiff has a clear legal right. *Crow v. McCallum,*

---

**6.** Neither the Governor nor Mr. Cleveland, head of the Judicial Nominating Commission, could recall another instance in which a state appellate judge had announced an intention to resign his commission for only one day.

215 Ga. 692, 113 S.E.2d 203 (1960). The thrust of defendants' rather novel argument appears to be that because plaintiffs acknowledge that they had no right to mandamus the Secretary to call a special election after Justice Bowles took the oath of office for his new term on December 15, 1980, they therefore concede that they have no right to a special election, and this court cannot grant plaintiffs the remedy they seek. Defendants' Final Brief, filed April 7, 1981 at 2.

█ Defendants' argument has little substance. The remedy of mandamus was, in fact, not available to the plaintiffs due to Justice Bowles' taking the oath of office for the new term and Justice Gregory's appointment on January 6, 1981.[7] The plaintiffs' acknowledgement that mandamus was unavailable is not, however, a concession that they have no federal claim or no right to a special election. This argument must be rejected. *See Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961).

### III. CONSTITUTIONAL ISSUES

#### A. *The Right to Vote*

█ Although the United States Constitution confers no right to vote as such, it does guarantee to every citizen the right to participate on a fair and equal basis with all other citizens in the electoral process once a state has chosen to select its public officials by popular vote. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506 (1964). The right to vote is federally protected because it is "preservative of other basic civil and political rights...." *Id.* at 562, 84 S.Ct. at 1381. "To the extent a citizen's right to vote is debased, he is that much less a citizen." *Id.* at 567, 84 S.Ct. at 1384. "No right is more precious in a free country than that of

having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. at 555, 84 S.Ct. at 1378.

█ The right to vote is clearly fundamental, and is protected by both the due process, *see, e. g., Williams v. Rhodes*, 393 U.S. 23, 43, 89 S.Ct. 5, 16, 21 L.Ed.2d 24 (1968) (Harlan, J., concurring); *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), and equal protection, *see, e. g., Williams v. Rhodes*, 393 U.S. at 38, 89 S.Ct. at 14 (Douglas, J., concurring); *Weisberg v. Powell*, 417 F.2d 388 (7th Cir. 1969), guarantees of the Fourteenth Amendment. In either case, "any alleged infringement of the right to vote must be carefully and meticulously scrutinized," *Reynolds v. Sims*, 377 U.S. at 562, 84 S.Ct. at 1381, for "a state has precious little leeway in making it difficult for citizens to vote...." *Williams v. Rhodes*, 393 U.S. at 39, 89 S.Ct. at 14. To survive strict judicial scrutiny, any state encroachment on the right to vote must be justified by a compelling state interest. *See Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

#### B. *Sufficiency of the Plaintiffs' Complaint*

The Constitution confers upon the states the "power to control the disposition of contests over elections to ... state and local offices." *Hubbard v. Ammerman*, 465 F.2d 1169, 1176 (5th Cir. 1972), *cert. denied*, 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973). The federal courts are neither empowered nor equipped to supervise the ad-

---

7. The Supreme Court of Georgia has held that "[m]andamus is available as a remedy where the duty to be enforced is one 'which exists at the time when the application for mandamus is

made or the writ is granted.'" *City of Atlanta v. League of Women Voters, Inc.*, 244 Ga. 796, 799, 262 S.E.2d 77, 79 (1979).

ministration of local elections. *See general-ly Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Accordingly, not every election irregularity gives rise to a constitutional claim cognizable under section 1983. As the Fifth Circuit recently observed,

> the determination that particular conduct constitutes a constitutional deprivation rather than a lesser legal wrong depends on the nature of the injury, whether it was inflicted intentionally or accidentally, whether it is part of pattern [sic] that erodes the democratic process or whether it is more akin to a negligent failure properly to carry out the state ordained electoral process....

*Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980), *citing Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

■ Section 1983 claims have been sustained on allegations of "dilution of votes by reason of malapportioned voting districts or weighted voting systems...; purposeful or systematic discrimination against voters of a certain class, ... geographic area, ... or political affiliation ...; election frauds ...; and other wilful conduct which undermines the organic processes by which candidates are elected...." *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975). The federal courts have refused to interfere, however, when the record established mere irregularities caused by mechanical or human errors attending the use of a new voting machine system, *see id.*, or when a number of non-party members were permitted to vote in a close primary election by mistake, *see Powell v. Power*, 436 F.2d 84 (2d Cir. 1970). Although no precise line can be drawn between state action which will prompt a federal court to grant relief and that which will not, federal court intervention is more likely when the attack is on "an officially-sponsored election procedure which, in its basic aspect, was flawed," than when the court is "asked to count and validate ballots and enter into the details of the administration of the election." *Griffin v. Burns*, 570 F.2d at 1078.

In this case, the plaintiffs contend that the defendants manipulated events to deprive them of their right, granted by the Constitution and laws of the state of Georgia, to vote to fill a vacancy on the Georgia Supreme Court. This court can conceive of no more fundamental flaw in the electoral process than the deprivation of the right to vote altogether. We conclude that, when evaluated in light of the appropriate legal standard, the plaintiffs' allegations state a claim for relief under section 1983.

## C. *The Plaintiffs' Constitutional Claim*

■ The right to vote, which encompasses "such distinct concerns as the citizen's opportunity to cast a vote, the community's chance to be represented within a larger polity in proportion to its population, the racial group's ability to prevent the purposeful dilution of its voting power, the candidate's capacity to ensure a place on the ballot, and the constituent's chance to contribute to a chosen candidate," L. Tribe, *American Constitutional Law* 737 (1978), implicates fundamental First Amendment and due process interests and is therefore protected, at least in part, by the due process and equal protection guarantees of the Fourteenth Amendment against state encroachment. If the right is denied altogether or abridged in a manner which renders the electoral process fundamentally unfair, a violation of due process may be found. If, on the other hand, the state discriminates in favor of some members of the electorate and against others, the equal protection guarantee may have been violated. Where, as here, the plaintiffs' allegations can be construed as either a total abridgement of the electorate's vested suffrage, or a scheme designed to enhance the suffrage of the conspiring defendants at the expense of the rest of the electorate, the plaintiffs could arguably state a cause of action under either clause. For the reasons that follow, however, we conclude that the plaintiffs' claim may more appropriately be predicated on a violation of due process.

## 1. *Equal Protection*

██ With respect to voting and other rights related to the electoral process, it is, as Professor Tribe observes, the equality with which they are made available that is often crucial. Thus, the equal protection clause has been held to guarantee to each citizen a right to equal treatment with respect to voting. *See* L. Tribe, *American Constitutional Law* 737, 992 (1978). As the Supreme Court has observed, "this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. at 336, 92 S.Ct. at 999. Of course, this right is not absolute for the states have the power "to determine the conditions under which the right of suffrage may be exercised ..., absent ... the discrimination which the constitution condemns." *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45, 50–51, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072 (1959).

██ In determining whether state action is impermissibly discriminatory in violation of the equal protection clause, the court looks to three factors: "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn v. Blumstein*, 405 U.S. at 335, 92 S.Ct. at 999. To survive strict scrutiny, the court must find that the classification is reasonably necessary to promote a compelling state interest. *See, e. g., Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Under this standard, the Court has invalidated state restrictions on the franchise based on race, *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); geographic location, *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); poverty, *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); political beliefs or party affiliation, *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, length of residency, *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274, and ownership of taxable property, *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

██ Not all classifications of citizens, however, are proscribed by the Fourteenth Amendment: only invidious discrimination is prohibited. "The Equal Protection Clause of the Fourteenth Amendment permits the States to make classifications and does not require them to treat different groups uniformly." *Williams v. Rhodes*, 393 U.S. at 39, 89 S.Ct. at 14. Although no clear statement of the classifications which will be found constitutionally offensive emerges from the cases, when so fundamental a right as voting is concerned, the courts have not hesitated to conclude that any conduct which favors the "ins" against the "outs" is impermissible. For example, a denial of equal protection was found when a state official guaranteed his friends favored positions on the ballot. *Weisberg v. Powell*, 417 F.2d 388 (7th Cir. 1969). And, in *Smith v. Cherry*, 489 F.2d at 1102, the court held that the defendants' scheme to use a sham candidate to shift to themselves the power to select their party's nominee constituted a violation of the equal protection guarantee because it worked "in favor of the ins and against the outs." Finally, in *White v. Snear*, 313 F.Supp. 1100 (E.D.Pa. 1970), the court found the conduct of the defendant county commissioners, who were also members of the Republican Board of Supervisors for the county, in giving their employees the day off to electioneer for the party's endorsed candidates to be a denial of equal protection. The court noted that the

> effect of defendants' conduct is to favor a certain segment of a political party and to perpetuate its power through an abuse of authority conferred upon defendants by the state. By doing so, they discriminate against all other segments and candidates within that party. A clearer violation of the Equal Protection Clause would be difficult to imagine.

*Id.* at 1104.

██ These rulings might be extended to support an equal protection claim by the

plaintiffs here: the defendants' conduct effectively vested the franchise in a class of two, Governor Busbee and Justice Bowles, thereby impermissibly discriminating against the rest of the electorate. However, that contention stretches the equal protection doctrine past its logical limits. As the Seventh Circuit has observed, the "gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action." *Briscoe v. Kusper*, 435 F.2d 1046, 1052 (7th Cir. 1970). The gist of the plaintiffs' complaint is a denial of the right to vote altogether, not an invidious classification of potential voters.[8] In our view, neither the plaintiffs' interests nor the coherent development of equal protection doctrine would be served by our straining to construe the plaintiffs' claim as one for denial of equal protection of the laws. That is especially true here, where the plaintiffs may secure redress under the due process clause, which protects fundamental rights against infringement regardless of the motivation of, or the classifications made by, the state defendants. *See, e. g., Williams v. Rhodes*, 393 U.S. at 41–43, 89 S.Ct. at 15–16 (Harlan, J., concurring).

### 2. Due Process

■ It is well settled that the interests encompassed by the right to vote are among the liberties protected against state infringement by the due process guarantee. If "the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore is in order." *Griffin v. Burns*, 570 F.2d at 1077. Thus, the retroactive invalidation of absentee and shut-in ballots cast in a primary election was held to be constitutionally impermissible. *See id.* In another instance, when the local Democratic committee offered a sham candidate, who re-

signed upon winning the nomination so that the committee could name the party's nominee, the court held that the defendants' actions "clearly debased the rights of all voters in the election. Such an abridgement of the right to vote is impermissible and evinces the sufficiency of this [section 1983] complaint." *Smith v. Cherry*, 489 F.2d at 1102.

■ Moreover, federal relief is warranted whenever broad-gauged unfairness permeates the election process, even if it derives from apparently neutral action. *See Ury v. Santee*, 303 F.Supp. 119 (N.D.Ill. 1969). As the Supreme Court noted in *Monroe v. Pape*, 365 U.S. at 187, 81 S.Ct. at 484, in holding that a section 1983 action for violation of rights secured by the due process clause need not be predicated on a showing of wilful conduct, the statute "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."

To prevail on their due process claim, the plaintiffs must establish that the defendants' actions deprived them of a right to vote in a special election to fill Justice Bowles' seat on the Supreme Court of Georgia. Under Georgia law, when a vacancy occurs during a justice's term of office, the seat is filled by executive appointment, Ga. Code § 2–3103, but when the vacancy occurs after a general election and prior to the commencement of the term, the seat is filled by a special election called for that purpose, Ga.Code § 34–1514. Thus, if Justice Bowles had taken no steps to leave the court prior to his resignation on January 5, 1981, Governor Busbee would clearly have been empowered to appoint his successor. Or, if Justice Bowles had withdrawn on November 20, 1980, and not taken the oath of office for his new term, it seems clear that a special election would have been called to select his successor.

---

8. We note that the plaintiffs in the instant action are voters only. There is no candidate or aspiring candidate who is joined as a plaintiff. Although voters' and candidates' interests overlap under the First Amendment, an unlawful classification of the "ins" versus the "outs" under the equal protection clause is more logically found where one of the plaintiffs is a candidate allegedly excluded from running for office by the defendant's actions. *See, e. g., Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978); *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973).

Our task would appear, then, to be relatively simple: determining whether Justice Bowles' seat became vacant prior to the commencement of his new term. The defendants conceded that Justice Bowles' November 20, 1980 letter had the effect of leaving his seat on the court vacant for at least one day—December 31, 1980—but, however, assert a number of arguments to avoid the conclusion which naturally flows from that concession. The defendants contend that Justice Bowles' November 20, 1980 resignation applied only to the term he then held and that he intended at all times to take the oath for, and enter upon the duties of, his new term. Moreover, they assert that Justice Bowles could not have resigned his new term on November 20, 1980, that a separate, distinct act of withdrawal would have been necessary to forfeit his right to take office for the new term. Finally, defendants contend that even if Justice Bowles resigned from his future term of office, that resignation was rescinded when he was sworn in on December 15, 1980 and commenced his duties after January 1, 1981. For the reasons that follow, we find these contentions unpersuasive.

■ First, we do not believe that the law contemplates or requires serial or multiple resignations for an incumbent officeholder who has been reelected to resign his position. The statute provides that any state office may be vacated "[b]y resignation, when accepted." Ga.Code § 89–501(2). Resignations of justices of the Supreme Court, like those of other officers whose commissions issue from the Secretary of State's office and whose offices may be filled by executive appointment, "shall be made to the Governor." Ga.Code § 89–504. Therefore, an incumbent state officer properly resigns whatever term he has remaining by letter to the Governor. Neither the statute nor common sense requires that an office-holder who has been elected to, but not yet entered upon, a new term submit two letters of resignation. One resigns from an office, not a term of office.

■ Second, the defendants make much of the language of the special election statute which requires a special election "whenever any person elected to public office shall die or withdraw prior to taking office. . . ." Ga.Code § 34–1514. They contend that a withdrawal, not a resignation, is necessary to invoke the statute. In our view, this contention is without merit. Although the statute specifies only death and withdrawal as events which trigger a special election, it seems clear that the legislature meant, by withdrawal, any voluntary vacating of the position to which one had been elected. The ordinary, logical means by which an incumbent voluntarily leaves office is by resignation. Therefore, if the statute is to serve its intended purpose, its language must be construed to encompass resignations. Moreover, we note that the defendants' awareness of the now assertedly crucial distinction between withdrawal and resignation appears to be of recent origin. By their own testimony, the defendants were unaware of the difference at the time Justice Bowles submitted his first resignation letter on November 20, 1980, and they failed to make the point during their depositions in this matter in early March 1981. Nor have the defendants cited us to any cases supporting their construction of the statute. In these circumstances, we decline to superimpose a technical requirement of "withdrawal" on the facially clear special election statute.

Furthermore, the defendants' contention that Justice Bowles intended to resign only from the term he was then serving is neither logical nor, when viewed in light of all the evidence, credible. While it is unusual for any public official who intends to continue holding office to submit a letter of resignation, it is extremely odd, as the defendants concede, for a resignation allegedly applicable only to that official's current term to be effective on the day that term would naturally expire as a matter of law. On the other hand, an official who intends to give up his office altogether might very well make his resignation effective on the last day of his present term since that is a logical and convenient termination date.

The defendants' actions also support the conclusion that they treated Justice Bowles' November 20, 1980 resignation as a decision to leave the court on the last day of the term or as a withdrawal from his office, not as a resignation of the last day of his term only. The Governor, Justice Bowles, and Charles Tidwell considered and discussed the timing of the justice's impending resignation at meetings in the Fall of 1980. With the aid of the Governor's office, Bowles timed his resignation expressly to assist the Commission and the Governor in choosing his successor. The Governor's office initiated the Commission's search for Bowles' replacement, interviewed candidates, and apparently chose his successor before Bowles' second resignation was tendered on January 5, 1981. After the plaintiffs' initiated their efforts, Busbee and Tidwell familiarized themselves with and discussed the special election statute at a meeting on November 24, 1980. The Governor subsequently stated at his December 4, 1980 press conference that he did not favor a special election to fill Justice Bowles' seat on the Supreme Court because of the cost involved and the probable low voter turnout, although he did announce that a special election would be held to fill the office of District Attorney for Bibb County.

Nor do Justice Bowles' own actions provide any greater support for the defendants' contention. At no point after the two press releases were issued by the Supreme Court on November 21, 1980 did Justice Bowles attempt to correct the alleged misconception, by then widespread among the media and the public, that he would be leaving office on December 31, 1980. Nor did he at any time request that the Governor halt the Commission's search for his successor. Finally, although the defendants testified that on the morning of January 5, 1981, Justice Bowles had not yet decided to resign, Governor Busbee had no knowledge of his imminent resignation, and Hardy Gregory had not had contact with the Governor since his December interview, Justice Bowles called Gregory, his replacement, that morning to discuss the transition.

Finally, the defendants contend that even if Justice Bowles resigned his office on November 20, 1980, he rescinded that resignation by taking the oath of office on December 15, 1980, and briefly entering upon his duties. We find that argument unpersuasive. Other than the acts specified, the defendants presented no evidence that Bowles intended to rescind his earlier withdrawal by taking the oath of office, or that the Governor consented to that rescission. The Judicial Nominating Commission was not notified to cease its search for his replacement, and the Governor's office picked up the list of nominees the day after the justice took the oath. Candidates were interviewed and Bowles' successor was chosen shortly thereafter. There clearly was no change in Bowles' intention to leave the court, or in the Governor's intention to select his successor. When considered in light of the evidence, Bowles' taking the oath of office for his new term is more logically seen as an effort to ensure the appointment of his successor than as a genuine reconsideration of his decision to leave the court.

In our view, the evidence establishes that Justice Bowles resigned his office, including his new term, on November 20, 1980, that the defendants had decided to replace the justice by appointment rather than by special election, and that the process by which the Governor selects and appoints justices to the appellate courts in Georgia had been initiated and was operating with the knowledge, consent, and cooperation of defendants Busbee and Bowles after November 20, 1980. To adopt the defendants' explanation for their actions would require a distortion of the facts, the statutes, and the obvious intent of the parties. The alternative and less strained explanation—that Bowles inadvertently resigned at a time when a special election would be necessary to fill his position—is more logical and likely. We conclude that the defendants' actions had the substantial effect of depriving the plaintiffs of their right to vote, and thus constituted a denial of due process.

Although the evidence establishes a constitutional violation, this court emphasizes that our conclusion is not based on a finding that the defendants' objective was to disenfranchise the voters. It has been the custom in the executive office over the years to appoint judges, and this practice has, in fact, frequently redounded to the public's benefit in the selection of able and qualified members of the judiciary. In this instance, however, the presumption that the office would be filled by appointment and the desire to exercise the Governor's prerogative overrode the statutory obligation to call a special election, and resulted in an infringement of the plaintiffs' right to vote.

## IV. RELIEF

### A. Declaratory and Injunctive Relief

Plaintiffs seek (1) a declaration that their constitutional rights have been violated, (2) an order requiring that a special election be held, (3) an order enjoining Justice Gregory from further serving on the court, and (4) an order enjoining Justice Gregory from running in the election as an incumbent.[9] Having concluded that plaintiffs have properly alleged and proved the section 1983 claim, we declare that plaintiffs' constitutional rights have been violated by defendants' actions, and that they are entitled to equitable relief.

The granting of equitable relief always involves a balancing of the interests at stake. Defendants argue that a special election would cost the state an estimated one million dollars. In addition, enjoining defendant Gregory from further service on the court pending the outcome of a special election would disrupt the court's work and disserve the public interest.

The plaintiffs have been deprived of a valuable and fundamental right. In this instance, the court concludes that the proper remedy is to order that a special election for Associate Justice of the Georgia Supreme Court be held. The cost to the state

of holding the election certainly is, or should be, a matter of concern for all citizens of this state; nevertheless, it is not a sufficiently compelling reason to deny plaintiffs the relief they seek. The restoration of the plaintiffs' right to vote outweighs the public expenditure involved.

An injunction against Justice Gregory's further service on the court pending the special election, however, presents different concerns. It is clear that the public interest would best be served by Justice Gregory's continued service, on the court during the period prior to the special election. There was substantial testimony at trial as to the detrimental effects on the judicial system and the court's workload when a hiatus occurs between the departure of a justice and the swearing-in of his successor. The entire community has an interest in the stable and orderly administration of justice.

The Governor is constitutionally empowered to fill vacancies on the court and to administer the oath of office. Although the Governor violated the plaintiffs' constitutional right to vote by appointing and swearing-in Justice Gregory to succeed Justice Bowles, the Governor's actions vested Justice Gregory with de facto authority to act as an Associate Justice both prior and subsequent to this judgment. See, e. g., Paige v. Gray, 399 F.Supp. 459, 466–67 (M.D.Ga.1975), vacated on other grounds, 538 F.2d 1108 (5th Cir. 1976); Tarpley v. Carr, 204 Ga. 721, 51 S.E.2d 638 (1949). Thus, although a vacancy on the court occurred which should have been filled by a special election, Justice Gregory is vested with the authority to continue on the court pending the outcome of the election. Therefore, Justice Gregory need not vacate the seat until the special election is concluded, and unless the results of the election so require. We do not believe that the appropriate remedy for vindication of the injury suffered by plaintiffs includes an injunction against the interim tenure of defendant Gregory.

---

**9.** Justice Gregory testified that he sold his home in Cordele, Georgia and moved his family to Atlanta after his appointment to the bench, and that if a special election for the office of Associate Justice were to be called, he intends to run as a candidate.

Plaintiffs also request, however, an injunction against Justice Gregory's inclusion on the ballot as the incumbent. Plaintiffs presented expert testimony at trial to support the generally-held belief that incumbency is an advantage in an election. *See, e. g., Clough v. Guzzi*, 416 F.Supp. 1057 (D.Mass.1976). Had defendants held a special election after November 20, 1980 as they were required to do by law, defendant Gregory would not have run as an incumbent. Permitting the justice to run as the incumbent candidate in the special election would affirm the Governor's unlawful exercise of his appointment power and unfairly tilt the election toward the Governor's chosen candidate. We will grant plaintiffs' request that defendant Gregory be enjoined from running as an incumbent in the special election.

### B. *Damages*

Plaintiffs seek one dollar each as nominal compensation for the denial of the invaluable right to vote. They also seek one million dollars in punitive damages from defendants Busbee and Bowles to be paid into the state treasury to help finance the special election.

█ Plaintiffs have shown a constitutional violation that caused them injury, and that defendants knew or should have known that their actions would have that effect. They are therefore entitled to damages. Even when there is no proof of actual injury, the denial of a constitutional right is actionable for nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). For the abstract injury to plaintiff's constitutional rights, they are entitled to be awarded the one dollar each that they seek.

█ An award of punitive damages in a section 1983 action, however, is proper only if the state defendants acted in bad faith or from an improper motive. *See, e. g., Harris v. Harvey*, 605 F.2d 330 (7th Cir. 1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980). Plaintiffs have not shown any malicious action or bad faith on the part of defendants, and are not entitled to punitive damages.

### C. *Costs and Attorney's Fees*

█ Plaintiffs shall recover their costs and reasonable attorney's fees from the defendants for time spent in litigating this action. 42 U.S.C. § 1988. The parties are directed to attempt to resolve the matter of attorney's fees among themselves. Failing agreement, however, plaintiffs may, upon submission of appropriate affidavits, petition the court for resolution of the matter.

### V. PENDENT STATE LAW CLAIM: FRAUD

Plaintiffs allege that defendants Busbee and Bowles committed acts of fraud by reinterpreting the meaning of the November 20, 1980 letter of resignation after plaintiffs demanded a special election, administering and taking the oath of office for Justice Bowles' new term on the Supreme Court, misrepresenting to the plaintiffs that the justice intended to serve his new term in office, and failing to disclose that Justice Bowles was going to resign from office on his first day in his chambers in the new court term. Plaintiffs contend that these fraudulent acts entitle them to injunctive relief and damages under state equitable and legal principles. Ga.Code §§ 37–702–704; 105–302.

█ Because we will grant plaintiffs relief on their constitutional claims, we need not reach the merits of plaintiffs' state law claim. To the extent that plaintiffs seek vindictive and punitive damages, however, we find that plaintiffs also fail to establish this damage claim under state law.

█ Ga.Code § 105–2002 provides for exemplary or punitive damages in tort actions where the factfinder concludes that the circumstances of the fraud are sufficiently aggravating. Ga.Code § 105–2003 provides for vindictive damages where "the entire injury is to the peace, happiness, or feelings of the plaintiff ...." Plaintiffs have neither alleged nor proved an injury to their emotional or mental well-being that could even theoretically fall under section

105–2003. To be entitled to punitive damages under section 105–2002, plaintiffs would have to show that the defendants' alleged misrepresentations or omissions constituted "an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights." *Ponce de Leon Condominiums v. DiGirolamo*, 238 Ga. 188, 189, 232 S.E.2d 62, 64 (1977). This standard is similar to that for awarding punitive damages under 42 U.S.C. § 1983, and such relief is not authorized by the evidence. Plaintiffs' state law claim will not support an award of punitive or vindictive damages.

In sum, the court hereby ORDERS

(1) That defendants are ENJOINED to take all necessary steps to hold a special election for Associate Justice of the Supreme Court of Georgia at the earliest possible date consistent with the requirements of state law, and defendants shall advise the court within twenty (20) days from the date of this order of a proposed timetable for holding the election;

(2) That defendant Hardy Gregory, Jr., is ENJOINED from running as an incumbent candidate in the special election;

(3) That plaintiffs are AWARDED $1.00 each in nominal damages for the denial of their constitutional rights to be paid by defendants; and

(4) That plaintiffs shall recover from defendants all reasonable attorney's fees and the costs of this action.

Accordingly, the court GRANTS IN PART plaintiffs' prayer for injunctive relief and damages as set forth in this order. The Clerk of the Court shall enter FINAL JUDGMENT in favor of plaintiffs in this action.

IT IS SO ORDERED.