Nicholas R. BACHUR, Sr.

v.

DEMOCRATIC NATIONAL PARTY, Democratic National Committee, Maryland State Democratic Party, and Marie M. Garber, in her official capacity as Administrator of the Maryland State Administrative Board of Election Laws [1].

Civ. No. B–84–1965.

United States District Court,
D. Maryland.

July 29, 1987.

1. In plaintiff's Amended Complaint, the named Administrator was Willard A. Morris. Mr. Morris resigned on November 16, 1984. Ms. Garber is the current Administrator, appointed to that office effective November 19, 1984. By stipulation of the parties, Ms. Garber has been substituted as a party for Mr. Morris. *See* Fed.R. Civ.P. 25(d)(1).

G. Stewart Webb, Jr., Kathleen Morris McDonald, Archibald R. Montgomery, IV and Venable, Baetjer and Howard, Baltimore, Md., for plaintiff.

Stephen J. Immelt, Russell T. Baker, Jr., George A. Nilson, Paul A. Tiburzi, Dorothy A. Beatty and Lee Baylin, Baltimore, Md., and Anthony S. Harrington, Elliot M. Mincberg and Hogan & Hartson, Washington, D.C., for defendants Democratic Nat. Party and Democratic Nat. Committee.

John T. Willis, Westminster, Md., and James B. Kraft, Ellicott City, Md., for defendant Maryland State Democratic Party.

Stephen H. Sachs, Atty. Gen., Jack Schwartz and Kathleen Howard Meredith, Asst. Attys. Gen., Baltimore, Md., for defendant Marie N. Garber.

WALTER E. BLACK, Jr., District Judge.

This litigation raises a series of complex legal questions at the heart of, and fundamental to, our democratic electoral system. The precise focus of the Court's inquiry is

the delegate selection process for the 1984 Democratic National Convention utilized in the State of Maryland by the Maryland State Democratic Party. The questions presented implicate the frontiers of constitutional law and affirmative action and require difficult legal, political, and sociological judgments; basic issues are presented, such as the right of a citizen to vote unencumbered, the right of a major political party independently to determine its delegate selection process, and the power and authority of courts to supervise or intervene in that selection process. Counsel have fully briefed all matters of concern to the Court. Several questions which have been expressly passed over by the Supreme Court, *see Cousins v. Wigoda*, 419 U.S. 477, 483 n. 4, 95 S.Ct. 541, 545 n. 4, 43 L.Ed.2d 595 (1975), must be decided today. As far as the Court can discern, this case is one of first impression.

## I

Plaintiff, Nicholas R. Bachur, Sr., is a resident of Towson, Maryland. In 1984, he was qualified and registered to vote in the Third Congressional District in Maryland as a member of the Democratic Party. Bachur has been a registered Democrat his entire voting life and usually plans to vote in Democratic primary and general elections. Because of a business trip to Toronto, Canada, which would take him out of Maryland on May 8, 1984, the date of the Maryland Democratic Primary, Bachur sought to vote by absentee ballot. Bachur, in fact, did vote in the primary by absentee ballot.

In this case, Bachur sues the Democratic National Party, the Democratic National Committee, the Maryland State Democratic Party, and Marie M. Garber, in her official capacity as Administrator of the Maryland State Administrative Board of Election Laws, *see supra* note 1. The Democratic National Party is a non-profit organization which, through the Democratic National Committee, promulgated rules for the selection of delegates to the 1984 Democratic National Convention. The Maryland State Democratic Party is a non-profit organization with its principal office in Maryland.

It issued rules in conformity with the mandatory guidelines set forth by the National Party to govern the selection of delegates in Maryland. Ms. Garber, in her official capacity, is responsible for overseeing the conduct of elections in Maryland; the Board of Elections administers and controls all primary and general elections. *See* Md. Ann.Code art. 33, § 1A–1(b), (e) (1986).

The conduct at issue here concerns the voting process, procedure, and requirements developed and implemented by the defendants for the Maryland Democratic Primary in 1984. As will be described in greater detail below, the defendants required voters to select an even number of male and female candidates for delegates to the 1984 Democratic National Convention when they voted in May, 1984.

The thrust of Bachur's claim is directed at the Democratic National Party's Charter. The Charter, as amended January 31, 1985, provides: "The National Convention shall be composed of delegates [divided] equally between men and women." The Charter & The By-Laws of the Democratic Party of the United States, Charter of the Democratic Party of the United States, Art. Two, § 4 (1985) [hereinafter referred to as "Charter"]. *See also* Charter, Art. Eleven, § 16 (membership of Democratic National Committee, the Executive Committee, Democratic state central committees, all national office party conventions, committees, commissions, and like bodies *shall be equally divided between men and women* ) (emphasis added).

Gender plays a special, albeit unique, role in the Party Charter and the specific rules implemented pursuant to the Charter for the 1984 Convention. The Democratic Party first required that each state delegation to the national convention consist of equal numbers of men and women in 1980. Democratic National Committee, Final Call for the 1980 Democratic National Convention II E (1979); *see* Note, *Affirmative Action in the Electoral Process: The Constitutionality of the Democratic Party's Equal Division Rule*, 15 U.Mich.J.L. Reform 309, 312–13 (1982) [hereinafter cited

as *Affirmative Action* ]. The purpose underlying the rule was to remedy prior discrimination against women. *See generally* Abzug, Segal & Kelber, *Women in the Democratic Party: A Review of Affirmative Action,* 6 Colum.Hum.Rts.L.Rev. 1 (1974) (hereinafter cited as Abzug) (tracing history of role of women in Democratic Party). At the 1980 Convention, delegates amended the Party Charter to require equal numbers of male and female delegates for future National Conventions. Note, *Affirmative Action, supra,* at 312–13.

The current Charter contains several provisions which reflect these principles. The National Committee, according to the Charter, shall be composed of, among others, "the Chairperson *and the highest ranking officer of the opposite sex* of each recognized state Democratic Party." Charter, Art. Three, § 2 (emphasis added). The members of the National Committee "from each state *shall be divided as equally as practicable* between committeemen and committeewomen." *Id.* at § 3 (emphasis added). The Charter, while prohibiting discrimination on the basis of *sex,* race, age, religion, economic status, sexual orientation, or ethnic origin, nonetheless requires National and State Democratic Parties to adopt and implement affirmative action programs. Charter, Art. Ten, §§ 2–3 (emphasis added). Said programs are particularly designed for minority groups, Blacks, Native Americans, Asian/Pacifics, Hispanics, women and youth. *Id.* at § 3.[2] The

goal of the program is representation as nearly as practicable as indicated by the particular group's presence in the Democratic electorate. *Id.* Quotas are expressly made impermissible. *Id.* at § 4. Somewhat paradoxically, the Charter further provides that "equal division at any level of delegate or committee positions between delegate men and delegate women or committeemen and committeewomen shall not constitute a violation of any provision thereof." *Id.* at § 6. The Charter may be amended by majority vote of all delegates to the National Convention, by two-thirds vote of the entire membership of the Democratic National Committee, or by two-thirds vote of the entire membership of any Democratic Party Conference. Charter, Art. Twelve, § 1.

Acting pursuant to the National Charter, the Democratic National Party adopted, on March 26, 1982, its delegate selection rules for the 1984 Democratic National Convention. Rule 6(C) is located within that portion of the rules titled "Affirmative Action." It provides in pertinent part: "State Delegation Selection Plans shall provide for equal division between delegate men and delegate women and alternate men and alternate women in the convention delegation." [3] The provision is commonly referred to as the "Equal Division Rule."

States had various options for implementing the Equal Division Rule, including primary elections, caucuses, and conventions.[4] The State party must follow the

---

**2.** Prior to the 1980 Convention, the affirmative action program was specifically directed towards native Americans, women, and youth. Delegates to the 1980 convention added the other groups reflected in the current Charter. Charter, By-Laws Adopted Pursuant to the Charter of the Democratic Party of the United States, Art. Seven, § 2(E).

**3.** The Court notes that Rule 6(A)(2), which expressly prohibits the imposition of mandatory quotas at any level of the delegate selection process, is not applicable to Rule 6(C); Rule 6(C) contains a second sentence which provides that "[n]otwithstanding subparagraph A(2) above, equal division at any level of delegate or committee positions ... shall not constitute a violation of any provision thereof."

**4.** The Democratic National Committee proposed four alternative methods. The first method, used as the caucus level, slated and elected men and women separately. The second option intertwined the primary and caucus procedures by holding an election primary, to be followed by selection caucuses; after the primary allotted delegates by candidate, the caucus elected an equal number of men and women. The third plan grouped candidates on the basis of gender and instructed voters to select an equal number of men and women. The last alternative recommended a caucus-convention system, as used in Iowa and Minnesota. *See generally* Note, *Affirmative Action, supra,* at 313 n. 14.

For the 1980 Convention, the Maryland Democratic Party used the second option described above. For the 1984 Convention, the state Party utilized the third plan described above.

National Party's rules; failure to comply could result in the State delegation not being allowed to participate in the National Convention. *See* Charter, Art. Two, § 2; *Democratic Party of the United States v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). In 1984, the Maryland Democratic Party opted to carry out the National Party's mandate by enacting a rule requiring that candidates for delegate be classified by gender on the ballot in a general primary election, voters choosing a certain number of delegates of each sex:

> Since the total delegation must be equally divided between men and women delegates and men and women alternates, the Congressional District delegates and alternates will be equally divided, with the candidates listed on the ballot by sex. The voters will be instructed to vote for the appropriate number of each. The voter will be allowed to vote for the total number of Delegates and Alternates allocated to his Congressional District. The highest vote getters will be the Delegates and the runners-up will be the Alternates.[5]

Amended Complaint, Appendix A. Maryland was entitled to send a total of seventy-four delegates and twenty-five alternates to the 1984 National Convention. Of the seventy-four delegates, the Maryland Democratic Party determined that forty-two would be elected at the Congressional District level by Democratic voters. Voters would select the following numbers of delegates and alternates in the primary:

| Congressional District | Delegates | Alternates |
|---|---|---|
| First | 5 | 1 |
| Second | 5 | 2 |
| Third | 6 | 2 |
| Fourth | 5 | 2 |
| Fifth | 5 | 2 |
| Sixth | 4 | 1 |
| Seventh | 6 | 2 |
| Eighth | 6 | 2 |

At oral argument, the Court inquired of counsel how delegates were evenly apportioned in those districts where the voters selected an odd number of delegates. Counsel indicated that the State Party flipped a coin to determine whether the "odd" delegate in such a District would be a woman or a man; in the next "odd" district, the gender selection would be reversed. Only by mere fortuity did the Third Congressional District (and plaintiff in this action) elect an equal number of male and female delegates. Pursuant to various Maryland statutes, *see, e.g.,* Md. Ann.Code art. 33, §§ 1–1, 5–3(a), 8–4, 12–1(b)(1), 12–2(b)(1), (2), 16–4(a–1) (1986), the Maryland delegate selection rule was implemented on the ballot for the May 8, 1984 primary.

Bachur received his absentee ballot on May 2, 1984. The portion of the ballot under attack in this case involves the selection of delegates to the 1984 Democratic National Convention. Bachur does not challenge the so-called "beauty contest" portion of the ballot where voters expressed a preference for a presidential candidate, which had no substantive ramifications, such as which delegates would be sent to the Convention. The ballot itself alphabetically listed two sets of delegates: males (from Abrams to Wray) and females (from Albinak to Wing). Candidates were listed under headings titled "Female Delegates and Alternates" and "Male Delegates and Alternates." Amended Complaint, Appendix A.

Each delegate was either pledged to a specific candidate or ran uncommitted. In the primary election for the Third Congressional District, thirty-four women and forty-three men sought to be delegates. Of the women, four were pledged to Mondale, four to Hart, five to Jackson, three to LaRouche, three to McGovern, and fifteen ran uncommitted. Of the men, four were pledged to Mondale, four to Hart, four to

---

In 1980, 36 states opted to hold primaries. Wicker, *Reforming the Reforms,* N.Y. Times, Jan. 30, 1981, at A27.

**5.** The Maryland Delegate Selection Plan was analogous to the plans of nine other states for the 1984 Democratic National Convention.

Memorandum of the Maryland State Democratic Party in Support of its Motion to Dismiss or, in the Alternative, for Summary Judgment, at 3. Bachur, apparently, is the only voter to have brought suit challenging the Equal Division Rule.

Jackson, three to LaRouche, four to Mc-Govern, and twenty-four ran uncommitted. Voters were directed to choose no more than four candidates from each list. Bachur's absentee ballot would not have been counted if he voted for more than four men or more than four women, even though the District was electing a total of eight persons.

The absentee ballot prepared for use in the 1984 Democratic Primary in the Third Congressional District in Maryland is the only ballot which has been submitted to the Court. However, voters in other Congressional Districts throughout the State apparently were similarly instructed to vote separately for male and female delegates.

## II

A few days prior to the 1984 Democratic National Convention, Bachur filed suit principally under 42 U.S.C. § 1983 in this Court. He argues that Rule 6(C), as implemented in Maryland, required Maryland voters to cast their votes on the basis of gender. According to Bachur, the Equal Division Rule as applied in Maryland violates several provisions of the United States Constitution, most notably the equal protection clause of the 14th Amendment and the fundamental right to vote, as well as various Maryland statutory and constitutional provisions. Bachur seeks injunctive and declaratory relief, as well as $1.00 nominal damages and attorney's fees. *See* 42 U.S.C. § 1988 (1981). He initially sought to enjoin the seating of the Maryland delegation to the 1984 Democratic National Convention.

The Democratic National Party and National Committee, the Maryland State Democratic Party, and Willard A. Morris, then Administrator of the Maryland State Administrative Board of Election Laws, *see supra* note 1, filed motions to dismiss the suit on June 6, 1984. Several weeks later, Bachur filed a motion for summary judgment. The full briefing of all these matters occurred on an expedited basis. On

July 12, 1984, Judge Norman P. Ramsey of this District heard all pending motions. Judge Ramsey denied plaintiff's motion for a preliminary injunction; he further denied defendants' motions to dismiss. Judge Ramsey reserved decision on the merits of this case for this Court.

At a subsequent status conference, counsel for all parties agreed that the issues raised in litigation should be considered only after the presidential election in November, 1984 and after the installation of the new Democratic leadership. The Court permitted the parties to renew their motions, if then appropriate. Dispositive cross-motions for summary judgment thereafter were filed on behalf of all parties. The germane facts are not disputed and have been set forth in some detail above. The Court heard oral argument on these matters on June 14, 1985 and is now prepared to rule.[6]

## III

Before the Court can reach the merits of the federal constitutional claims pressed by Bachur, four preliminary issues raised by defendants must be addressed. These issues relate to questions of standing, mootness, state action, and justiciability, which are legal concepts derived from the constitutional requirement embodied in Article III that federal courts adjudicate only actual cases or controversies. If any of these hurdles are not cleared, the Court is precluded from deciding the merits of plaintiff's case.

The doctrines that elaborate the "case or controversy" requirement are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Recognizing the amorphous nature of these concepts, it has been noted:

All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different

---

6. At oral argument, the Court granted plaintiff's motion to amend his complaint by interline-ation. *See* Paper 32.

though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

*Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (*quoting Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir.) (Bork, J., concurring)), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983). The Court will now examine each question *seriatim.*

### A

The standing inquiry operates on two levels. Defendants challenge first whether Bachur has standing to sue on his own behalf and, second, whether he has standing to sue, as a voter, on behalf of candidates for delegate.

It is axiomatic that, although the legal claim may be correct, the litigant advancing it must be properly situated to be entitled to its judicial determination. *See generally* 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3531 (1984) [hereinafter cited as Wright & Miller]. The standing requirement is essential preliminary to reaching the merits of the claim, focusing on the party seeking to get his complaint before a federal court, not on the issues he wishes to have adjudicated. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); *see also Leaf Tobacco Exporters Association, Inc. v. Block,* 749 F.2d 1106, 1110–11 (4th Cir.1984).

In order to satisfy the constitutional requirement of Article III that there be an actual case or controversy, courts require a plaintiff to have a personal stake in the outcome. *See, e.g.,* Wright & Miller, *supra* p. 11. One commonly-quoted version of the standing "test" requires a plaintiff to show injury of any kind, economic or otherwise, *see Valley Forge,* 454 U.S. at 486, 102 S.Ct. at 766, as opposed to something abstract or

speculative, *see Allen,* 468 U.S. at 752, 104 S.Ct. at 3374. While recognizing that the terms employed to assess standing do not make application of the standing requirement a mechanical exercise, the *Allen* Court did offer certain guideposts. As stated therein, "a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 751, 104 S.Ct. at 3324. The Court emphasized that federal courts may exercise power only in the last resort and as a necessity. *Id.*

▮ Applying the standing "test" to Bachur, it appears clear beyond peradventure that plaintiff has standing as a voter and on behalf of the candidates for delegate to assert all the claims he raises in this suit. The critical, undisputed fact is that Bachur did vote in the Democratic primary and he was arguably adversely affected by the voting rules and procedures. The Third Congressional District was slated to elect eight delegates to the Convention; Bachur, as a voter, was required to select no more than four men and no more than four women. Forty-three men and thirty-four women ran as potential delegates on the ballot. Plaintiff certainly has shown the direct and palpable injury that is required by the courts because he was hamstrung when he attempted to exercise his right of franchise; Bachur was not free to vote for the eight delegates of his choice. This suffered injury is directly traceable to the Equal Division Rule, as implemented by the Maryland Democratic Party and the State of Maryland. Relief from the injury most certainly will result if this Court reaches a favorable decision on the merits and grants the requested injunctive and declaratory relief; there will be no further interference by the Equal Division Rule with Bachur's vote.

Defendants argue, in part, that Bachur has suffered no injury because none of the Presidential candidates slated more than four delegates of either gender on the ballot; thus, defendants argue that Bachur could not have been harmed. For instance, if Bachur supported candidate Mondale, he

would have voted for the eight delegates pledged to Mondale, of whom four happened to be men and four happened to be women. The Court rejects this argument. As a factual matter, the premise underlying defendants' conclusion is incorrect. Five women delegates were pledged to candidate Jackson: Baldwin, Bohanan, Brown, Johnson and Lawes. Amended Complaint, Appendix A. Based on this one example, it is clear that a voter who supported female delegates for candidate Jackson in the Third Congressional District would have had his choices limited by the rules, and thus been harmed.

In addition, this argument ignores the fact that there were uncommitted delegates, in fact fifteen women and twenty-four men. A voter may prefer to vote utilizing his or her appraisal of the eight most qualified candidates, no matter whom they support for President, or indeed, regardless of their gender. Or, the voter may wish to cast the eight votes for all men, all women, all Black, all White, or any combination based entirely on personal preference. In any event, a voter who wished to vote for all five Jackson women delegates was unable to do so.

Nor is defendants' argument persuasive that the only person who would have standing to assert these constitutional claims would be an uncommitted male delegate in the Third District who received fewer votes than four other male delegates, but more votes than any female delegate. The Court is aware of no prior decision which has resolved this type of standing claim. The Supreme Court has noted, however, that it is entirely appropriate, even advised, to answer standing questions by comparing the allegations of the particular complaint to similar cases. *Allen*, 468 U.S. at 751, 104 S.Ct. at 3324.

Moving to the second level of defendants' standing argument—namely, that Bachur cannot assert the claims of the candidates—the Court notes that several decisions have found voter standing on behalf of a candidate against whom an impermissible rule directly operates. *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 786,

103 S.Ct. 1564, 1568, 75 L.Ed.2d 547 (1983) (in approaching candidate restrictions, essential to examine extent and nature of impact on voters); *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) (voter has standing to challenge constitutionality of filing fee requirement which directly impacts against candidate). Voters have standing when challenging delegate allocation plans, *see e.g., Bode v. National Democratic Party*, 452 F.2d 1302 (D.C.Cir.1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972); *Georgia v. National Democratic Party*, 447 F.2d 1271 (D.C.Cir.), *cert. denied*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). An individual who claims that his vote is diluted because his representative represents a greater number of constituents than do other representatives in the same assembly has standing to challenge the constitutionality of the apportionment scheme. *Ripon Society, Inc. v. National Republican Party*, 525 F.2d 567, 572 (D.C. Cir.1975), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976); *Baker v. Carr*, 369 U.S. 186, 204–08, 82 S.Ct. 691, 703–05, 7 L.Ed.2d 663 (1962). This determination should come as no great surprise since a state imposed impediment on a person's candidacy directly harms the voters who support that candidate. As the Supreme Court said in *Bullock, supra*, at 143, 92 S.Ct. at 856:

> [T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.

The Court noted in *Anderson v. Celebrezze* that the primary concern is not the interests of the candidate, but rather the interests of the voters who choose to associate together and support the candidate's views. 460 U.S. at 806, 103 S.Ct. at 1579. Standing was not limited in *Anderson v. Celebrezze* to the candidate himself but included his supporters. Bachur, thus, can also challenge the categorization of delegates by gender on the ballot.

When reduced to its common denominator, defendants' arguments do not challenge Bachur's standing on each constitu-

tional or statutory theory presented; the inquiry instead is whether Bachur, as a voter, has standing or whether only an unsuccessful delegate has standing. The Court finds that Bachur, as a voter, has suffered injury in fact and has standing to assert claims as a voter and claims on behalf of candidates for delegate.

## B

A second threshold matter involves the question of mootness. The mootness doctrine likewise is a function of the Article III requirement that judicial power extend only to cases or controversies. *See U.S. Parole Commission v. Geraghty,* 445 U.S. 388, 395–96, 100 S.Ct. 1202, 1208–09, 63 L.Ed.2d 479 (1980); *Defunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). In general, a case becomes moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Murphy v. Hunt,* 455 U.S. 478, 481–82, 102 S.Ct. 1181, 1183–84, 71 L.Ed.2d 353 (1982); *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). The mootness doctrine is a flexible one which must be evaluated based on the particular facts and circumstances presented in a particular case.

The Supreme Court has recognized a general exception to the mootness doctrine in cases that are "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Murphy,* 455 U.S. at 482, 102 S.Ct. at 1183; *see also LaRouche v. State Board of Elections,* 758 F.2d 998, 999 (4th Cir.1985). The Court has noted that

> in the absence of a class action, the 'capable of repetition, yet evading review' doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same

complaining party would be subjected to the same action again.

*Murphy,* 455 U.S. at 483, 102 S.Ct. at 1184, *quoting Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam). A mere physical or theoretical possibility will not satisfy the *Weinstein* test. *Murphy,* 455 U.S. at 482, 102 S.Ct. at 1182. Rather, there must be a "reasonable expectation" or a "demonstrated probability" that the same controversy will recur. *Id.*

In the case at hand, the 1984 Democratic National Convention has come and gone. Maryland sent its delegation to that convention, pursuant to the mandate imposed by the National Party's Equal Division Rule. Rule 6(C) no longer has any legal, binding effect. Moreover, the delegate selection rules for the 1988 National Convention have not yet been formulated. At the state level, the membership of the Democratic State Central Committee was not elected until September, 1986. Only after that election occurs will the relevant rules for implementation of the as-yet undeveloped national plan be determined for Maryland.

However, the record indicates that the Democratic National Party Charter remains effective and binding on the Party. The Charter, as described in greater detail above, contains various provisions that relate to the Equal Division Rule, including the requirement that delegates to national conventions be equally divided between females and males. In the event that *no* delegate selection rules were implemented for the 1988 Convention, states would still be required to send equal numbers of male and female delegates. Furthermore, until the next Convention meets, the Charter can be amended only by super-majority vote which likely would be difficult to marshal. Charter, Art. Twelve, § 1. Lastly, the inertia in any large bureaucracy, such as a major political party, is against making changes.

Weighing these contrasting arguments, it would be difficult to assess whether or not the case is moot in its own right. The "capable of repetition, yet evading review"

exception, however, clearly does apply, and it saves this case from being determined moot. In order to reach this conclusion, the Court must consider whether the two relevant factors set forth by the Supreme Court have been satisfied: first, whether the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and, second, whether there is a reasonable expectation that the same complaining party would be subject to the same action again. *See Murphy*, 455 U.S. at 482, 102 S.Ct. at 1183.

In this particular case, the Party Charter has contained the Equal Division Rule since 1980, the National Party Rule was promulgated in 1982, and the State Administrator received from the Central Committee of the Maryland State Democratic Party the certification of the State Party's plan for the selection of delegates to the Democratic National Convention on February 9, 1984. Plaintiff, however, did not learn about the Rule until he received his absentee ballot on May 2, 1984, six days before the Maryland primary. He filed suit thereafter, and the parties attempted to present the full matter to Judge Ramsey for final decision three days before the Democratic National Convention.

Clearly, Bachur could have instituted suit in Maryland once the Maryland State Democratic Party announced its procedure; Judge Ramsey, in fact, found plaintiff barred by laches in this regard. But, under state law, the certification must be made "[n]ot later than 90 days prior to the primary election." Md.Ann.Code art. 33, § 12–2(b)(2) (1986). For issues of constitutional magnitude, the challenged action cannot be fully litigated in the brief amount of time expressly permitted by statute. *But cf. O'Brien v. Brown*, 409 U.S. 1, 3, 92 S.Ct. 2718, 2719, 34 L.Ed.2d 1 (1972) (per curiam) (Court determined that it lacked sufficient time to reach final decision on the merits, when it received the case only four days before the National Convention was scheduled to begin).

The earliest time that Bachur could have brought suit was in 1983, when the State Party began holding public hearings on the issue. Had suit been brought then, the full resolution of the entire matter likely would not have occurred before the election. Inevitably, the suit would have been challenged on grounds of ripeness, because a final rule had not yet issued. Bachur would likely have been ordered to wait until the State Party sent its certification to the State Administrator, which only must occur ninety days prior to the election. Given the short time frame specified by statute, this Court believes that a strict interpretation of the mootness doctrine would work a great hardship on the litigants. The pressures of time would lead to either a hasty decision or a finding of mootness. The concept of mootness is indeed flexible enough to account for the particular situation presented.

*Murphy* further requires a court to assess whether there is a reasonable expectation that the same complaining party would be subject to the same action in the future. The Court finds such a probability does exist. The National Party Charter remains in effect, and the import of its provisions has been assessed above. Worth noting is that an Equal Division Rule was required for both the 1980 and 1984 Conventions, and one will issue for the 1988 Convention if the status quo is preserved. The more problematic question would be for the Court to assess whether the Maryland Democratic Party will opt to hold a primary for delegate selection in 1988. In each presidential election year since 1972, when Convention rules were greatly liberalized, Maryland Democratic voters have expressed their preference in a presidential primary. In 1980, the delegate selection process occurred at two levels. First, a presidential preference primary was held, and delegate slots were apportioned to the candidates according to the percentage of the vote each presidential candidate won. Registered Democrats then met by congressional district to choose the convention delegates, in a caucus system. Counsel for the Maryland Democratic Party stated at oral argument that this system was not continued because less than one percent of registered Democrats participated in the actual delegate selection. In its place, in

1984, a primary was held with delegates being directly selected by voters, on the basis of gender. From this limited history, it would appear more likely than not that Maryland Democrats will vote in a primary election in 1988 for the delegates to the national convention.

Bachur was and remains a registered Democrat. In the event that a court finds this case moot, there does exist a reasonable probability that Bachur will be subjected to the same action.

In election cases, the possibility of mootness always exists because the matter generally cannot be fully resolved before the election occurs. When faced with the issue, however, the Supreme Court appears to take a dim view of application of the mootness doctrine. In four decisions, the Court has rejected without any substantial discussion the claim of mootness. *See Anderson,* 460 U.S. at 784 n. 3, 103 S.Ct. at 1567 n. 3; *Democratic Party of the United States,* 450 U.S. at 115 n. 13, 101 S.Ct. at 1013 n. 13; *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969). As stated in *Storer:*

> The 'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks. The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held.

415 U.S. at 737 n. 8, 94 S.Ct. at 1274 n. 8. Bachur, of course, has brought an 'as applied' action against the operation of the Equal Division Rule.

In a recent Fourth Circuit decision, the court reached the merits of an action in which presidential candidate Lyndon H. LaRouche sought to place his name on the ballot of North Carolina's 1984 primary election. *LaRouche,* 758 F.2d at 998. The primary and general elections were both held, without LaRouche's name on the ballot. The issue in the case was whether LaRouche's name should have been placed on the ballot. The appellate court, without analysis, merely stated the conclusion that the case was one which was "capable of repetition, yet evading review." *See also Dart v. Brown,* 717 F.2d 1491, 1493 n. 3 (5th Cir.1983), *cert. denied, sub nom., Libertarian Party of Louisiana v. Brown,* 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984); *Keane v. National Democratic Party,* 475 F.2d 1287, 1288 (D.C.Cir.1973) (MacKinnon, J., concurring in part and dissenting in part) (action not moot insofar as it constitutionally challenges National Democratic Party Guideline, although Convention passed, because constitutional validity almost certain to recur and timing of its likely reoccurrence close to national presidential elections make it evasive of review within available time).

The Court finds in this case that Bachur has presented a matter that is "capable of repetition, yet evading review." Accordingly, the case is not moot.

■ Courts are not required to decide whether a case falls within the "capable of repetition, yet evading review" exception when a claim is pressed for actual and punitive damages; in those cases where the claim is not so insubstantial or so clearly foreclosed by our jurisprudence, the claim is not deemed moot. *See Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 8–9, 98 S.Ct. 1554, 1559–60, 56 L.Ed.2d 30 (1978); *Ash v. Cort,* 496 F.2d 416, 419 (3d Cir.1974), *rev'd on other grounds,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

Plaintiff here seeks nominal damages of $1.00 and reasonable attorney's fees. He argues that these prayers for relief preclude a finding of mootness. In light of the Court's determination that this case is indeed "capable of repetition, yet evading review," no finding is expressed with regard to the argument that a $1.00 nominal damages claim is sufficient to preserve the lawsuit even if the claims for injunctive and declaratory relief are moot.

## C

In order for the Court to have jurisdiction over, and consider the merits of, plaintiff's fourteenth amendment constitutional claims, there must be state or governmental action; the Constitution does not regulate the private actions of individuals.[7] *See generally* L. Tribe, American Constitutional Law §§ 13–23, at 18 (1978) [hereinafter cited as Tribe]; Rotunda, *Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 Tex.L.Rev. 935, 950–60 (1975); Note, *Affirmative Action, supra*, at 315–18. An essential dichotomy is set forth in the Fourteenth Amendment between deprivation by the State, subject to scrutiny under the Constitution, and private conduct which, however discriminatory or wrongful, cannot be successfully challenged under the Fourteenth Amendment. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982), *quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 452, 42 L.Ed.2d 477 (1974). Apparently, no state action is required with respect to Bachur's constitutional claim that the Equal Division Rule infringes his fundamental right to vote. *See United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037, 85 L.Ed. 1368 (1941). The question presented by Bachur under the Fourteenth Amendment in the context of the delegate selection process is not an easy one. The Supreme Court has expressly reserved ruling on "whether the decisions of a national political party in the area of delegate selection constitute state or governmental action." *Cousins*, 419 U.S. at 483 n. 4, 95 S.Ct. at 545 n. 4.

In decisions prior to *Cousins*, the Supreme Court found that certain activities by a National party do constitute state action either because the party performed a public function or because it was, in effect, an arm of the State. When a political party conducted a primary unregulated by the State, and the primary was the only effective part of the electoral process, state action was found. *See Terry v. Adams*, 345 U.S. 461, 469–70, 73 S.Ct. 809, 813–14, 97 L.Ed. 1152 (1953). The so-called White Primary cases further illustrate that the actions of a political party will be subject to constitutional scrutiny. *Id.; see also Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927).

The question becomes whether these decisions have withstood the test of time, given the Court's express disclaimer in *Cousins* in the particular context of the delegate selection process. Clearly, the rules and practices of the Democratic National Party, insofar as they are self-regulatory, constitute mere private action. The same may well be true of the Maryland Democratic Party. But "something more" can "convert the private party into a state actor." *Lugar*, 457 U.S. at 939, 102 S.Ct. at 2754.

One proposed taxonomy to determine whether state action exists would find "all activities of political parties that are closely related to the nomination of a candidate who will receive some preferential state treatment as the nominee of a political party are deemed the state's responsibility; other activities of political parties constitute private action." Tribe, *supra*, at 788. If this test were adopted, the Court finds that state action certainly exists. The Equal Division Rule, as implemented in Maryland by the Maryland Democratic Party, is clearly related to the ultimate selection of the party's candidate: voters select delegates who attend the party convention, at which time they nominate the party's candidate (to whom they might have been previously pledged) and select, for the first time, the party's vice-presidential candidate. The candidate for delegate receives special state treatment by appearing on the ballot; the presidential candidate receives special treatment because, based on activities undertaken at the convention, his name is placed on the ballot for the general elec-

---

7. An exception to this rule is the Thirteenth Amendment's prohibition of slavery. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

tion. The state thus delegates the decidely governmental function of determining who may gain a place on the ballot. *Id.* at 790.

Because Professor Tribe's formula has not been adopted by the Supreme Court, it is prudent to analyze the facts presented under the Court's own test. The Court has set forth a two-pronged approach to determine whether "the conduct allegedly causing the deprivation of a federal right [may] be fairly attributable to the State." *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753. As stated therein:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Id.*

Initially, the issue is whether plaintiff has been deprived of an identifiable constitutional right. Defendants argue at great length that plaintiff has not been so deprived, contending that no fundamental right to vote exists as to the selection of delegates to national party conventions. Defendants' argument on this question, however, places Bachur in an unenviable Catch–22 situation. Bachur's claim concededly is one of first impression. The merits of his cause of action will establish whether or not there has been a constitutional violation. At this stage of the inquiry, only the procedural barriers to a consideration of the merits are being raised. To find that no state action exists because Bachur has not been deprived of any rights under the Constitution would be to prejudge the merits of his cause of action.

Nonetheless, if plaintiff must indicate a particular constitutional right which has been infringed by the defendants, the Court finds that such a right at least argu-

ably does exist. There certainly is a fundamental right to vote in whatever electoral process is used. *See infra* Section IV; *Classic,* 313 U.S. 299, 61 S.Ct. at 1031. The right exists even if a private party conducts the process, unregulated by the State. *See Terry,* 345 U.S. 461, 73 S.Ct. at 809. The deprivation here involves Bachur's fundamental right to vote and how it was affected at the primary stage by the directive to vote for no more than eight candidates for delegate, of whom no more than four could be female and four could be male. *See* U.S. Const. art. I, § 2. amends. XV, XVII, XIX.

The next focus under *Lugar* is whether the State in some manner caused this deprivation. The ballot issued pursuant to Maryland state law. Md.Ann.Code art. 33, § 14–1 (1986). Indeed, the state provides ballots and voting booths for the election, *id.,* regulates the manner by which one becomes a candidate, *id.* at § 12–6, supervises the primary, particularly if a nomination is contested, *id.* at §§ 13–1 through 13–7, provides the voting machines, *id.* at § 16–1, and generally administers the election, *id.* at § 1–1 *et seq.* For this election, the State approved, and certified to each local board, ballots for the election of delegates. *Id.* at §§ 5–3(b), 16–4(a)(1). Obviously, the Administrator of the Baord of Elections did, in fact, directly "cause" plaintiff's deprivation.

The State did not act on its own initiative or, for that matter, alone. It followed the election procedures promulgated by the Maryland Democratic Party for the primary, as required by state law. *Id.* at §§ 12–1(b)(1), 12–2(b)(1), (2). These rules dictated how Maryland would implement the Equal Division Rule. The State Party decreed whose names would be placed on the ballot, the separation by gender on the ballot, the number of candidates who would be elected by District, and the fact that certain Districts would elect odd numbers of delegates while others would elect even numbers of delegates. The Rule itself had been drafted by the National Party and Democratic National Committee, as described earlier in greater detail.

The first prong of the *Lugar* test is satisfied as to all defendants. The State of Maryland actually imposed the rule of conduct at issue in this litigation. It was done at the express direction of the Maryland Democratic Party which, in turn, was required to so act by the National Party and its Equal Division Rule. The National and State parties in effect became state institutions in the promulgation and implementation of the Rule. *See Terry*, 345 U.S. 461, 73 S.Ct. at 809; *Rice v. Elmore*, 165 F.2d 387, 389–392 (4th Cir.1947), *cert. denied*, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948); *Maxey v. Washington State Democratic Committee*, 319 F.Supp. 673, 678 (W.D.Wash.1970).

■ The second prong of the *Lugar* test requires a determination of whether each defendant is a state actor. Based on the nature of the job of Administrator and the Administrator's particular role in the 1984 primary elections, *see* Md.Ann.Code art. 33, § 1A–1 *et seq.*, that official obviously is a State actor.

■ The Democratic National Party and Democratic National Committee are linked to the Government in many ways, including pervasive regulation of party selection procedures in nearly every state, automatic ballot access in every state, federal campaign financing, and state funding of primaries. Note, *Affirmative Action*, *supra*, at 317–18. For presidential nominating conventions, major political parties, obviously including the Democratic Party, are entitled to the maximum payment of $4,000,000 from the federal government, as adjusted by the Consumer Price Index. 26 U.S.C. § 9008(b)(1) (1987); 11 C.F.R. § 9008.1(a) (1985). Focusing particularly on the role of the National Party in Maryland, its mandate for the Convention became effective once the State Party opted to hold a primary. Moreover, without use of the state facilities, the Equal Division Rule in Maryland would not have been implemented. The Court is satisfied that, with regard to the delegate selection process for the national convention, the National Party has received significant aid from government officials and is a state actor.

■ The Maryland Democratic Party has received similar support from the State and is a state actor as well. The State Party's activities have the imprimatur of state law. Membership on the State Central Committee is chosen by election, Md. Ann.Code art. 33 at § 11–1, *et seq.* By law, this Committee is the governing body of the party in Maryland. *Id.* at § 11–3. The State Party acted in such a manner that its conduct for the 1984 primary is "otherwise chargeable" to the State. As described above, the party decreed whose names would be placed on the ballot, the separation by gender on the ballot, the number of candidates who would be elected by District, and the fact that certain Districts would elect odd numbers of delegates while others would elect even numbers of delegates. The State was bound to follow the Party's dictates.

The question of state action here does not involve an internal rule of a private organization. *See Seergy v. Kings County Republican County Committee*, 459 F.2d 308, 314 (2d Cir.1972). The National Party is not a mere "country club" setting forth its house rules. *See Rice*, 165 F.2d at 389. The Court is not faced with a challenge to the Party's internal decisions to have equal numbers of women and men on various Party committees. Charter, Art. Eleven, § 16. That situation may differ from the case at hand. Here, by contrast, the Party's policies directly impact on the voters. And, the policies take precedence over State Party rules and State statutes. *E.g., Tashjian v. Republican Party of Connecticut*, —— U.S. ——, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986); *Democratic Party of the United States*, 450 U.S. 107, 101 S.Ct. 1011; *Cousins*, 419 U.S. 477, 95 S.Ct. 545.

■ State action exists when a major political party [8] promulgates a rule later

---

**8.** Congress has defined major party as, "with respect to any presidential election, a political party whose candidate for the office of President in the preceding presidential election received, as the candidate of such party, 25 percent or more of the total number of popular

subject to constitutional challenge, and the state party, in implementing that rule, directly invokes the power of the state by utilizing the state's electoral machinery. The activities of the Democratic Party were inextricably linked to the nomination of candidates for delegate to the Convention and to the selection of the party's presidential candidate, who received preferential state treatment in the ensuing presidential election.

### D

■ The final threshold barrier imposed by Article III is the oft-stated requirement that plaintiff's claim be justiciable. Justiciability is characterized as part of the political question doctrine, where courts refuse to become entangled in disputes between the Executive and Legislative Branches because it is perceived that certain matters are better resolved by the political process than by judicial review. *See, e.g., Luther v. Borden,* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). The question is whether decisions made by a major political party relative to the selection of delegates for a national convention similarly should not be subject to judicial review.

The Supreme Court has declined to rule on this question. The intimations from particular Justices and other lower courts do not lead to an ineluctable conclusion. However, based on the particular facts and circumstances presented in this case, the Court finds the matter to be justiciable.

The justiciability of party delegate selection disputes has its roots in *O'Brien v. Brown,* 409 U.S. 1, 92 S.Ct. 2718. In *O'Brien,* plaintiffs challenged the recommendation of the Credentials Committee of the 1972 Democratic National Convention regarding the seating of certain delegates from Illinois and California. The Court of Appeals held that the action of the Committee on the California delegate dispute violated the Constitution. *Brown v. O'Brien,* 469 F.2d 563 (D.C.Cir.1972). Petitions for writs of certiorari were filed on July 6,

1972, only four days before the commencement of the National Convention.[9] The Court determined that, in the limited available time, it could not give sufficient consideration warranted for final decision on the merits. Accordingly, the Court took no action on the petitions for certiorari. Of significance to the Court in reaching this determination was the fact that the recommendations of the Credentials Committee had not yet been submitted to, or considered by, the National Convention. The Court also faced pending applications by the litigants to stay the judgment of the lower court which had found that the action of the Credentials Committee violated the Constitution. After weighing the applicable factors, the Court issued stays.

Focusing on the issue of justiciability, the Court noted that

[n]o case is cited to us in which any federal court has undertaken to interject itself into the deliberative processes of a national political convention; no holding of this Court up to now gives support for judicial intervention in the circumstances presented here, involving as they do, relationships of great delicacy that are essentially political in nature.

*Id.* 409 U.S. at 4, 92 S.Ct. at 2720. The Court distinguished a case in which injury would arise from invidious discrimination based on race in a primary contest within a single State. *Id.* at n. 1, 92 S.Ct. at 2720 n. 1. The Court further stated:

Judicial intervention in this area traditionally has been approached with great caution and restraint.... It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated. Thus, these cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of the political parties.... [W]e entertain

---

votes received by candidates for such office." 26 U.S.C. § 9002(6) (1987).

9. The District Court heard argument and decided the case on July 3rd; the Court of Appeals entered its judgment on July 5th.

grave doubts as to the action taken by the Court of Appeals.

*Id.* at 4–5, 92 S.Ct. at 2720.

The next relevant Supreme Court decision is *Cousins v. Wigoda,* a case in which Democratic voters in Chicago, Illinois, challenged the seating of delegates at the 1972 Democratic National Convention. 419 U.S. 477, 95 S.Ct. 541. The precise issue before the Court was whether Illinois state law or the National Party's rule should be given primacy, when in conflict, in determining the qualifications for and eligibility of delegates to the National Convention. The Court found in favor of the National Party's rule. With regard to justiciability, the Court expressly emphasized that it did not decide the following question:

> Whether the decisions of a national political party in the area of delegate selection constitute state or governmental action, and, if so, whether or to what extent principles of the political question doctrine counsel against judicial intervention.

*Id.* at 483 n. 4, 95 S.Ct. at 545 n. 4. To date, the Court has not revisited this question.

Two Justices have expressed diametrically opposed views on the issue of justiciability. In his *O'Brien* dissent, Justice Marshall reviewed the nature and purposes of the political question doctrine. 409 U.S. at 11–13, 92 S.Ct. at 2723–24. Justice Marshall noted that courts decline to decide political issues only out of deference to the separation of powers, and that neither the Executive nor the Legislative Branches of government has jurisdiction over the asserted claims. Justice Marshall apparently would find claims such as those made in *O'Brien* justiciable.

Chief Justice Rehnquist, acting in his capacity as Circuit Justice, has stated a contrary view. In *Republican State Central Committee of Arizona v. Ripon Society, Inc.,* 409 U.S. 1222, 93 S.Ct. 1475, 34 L.Ed.2d 717 (1972), challenge was made to the Republican National Party's decision to adopt a certain mode of allocating delegates to the 1976 Convention. Application was made to Justice Rehnquist for a stay

of the District Court order enjoining the 1972 Republican National Convention from adopting its delegate selection formula (after Justice Douglas had declined to do so). Relying entirely on the majority's *O'Brien* language, which expressed "grave doubts" about judicial intervention, Justice Rehnquist granted a stay.

Lower courts have also not given clear guidance on the justiciability issue. Within the United States Court of Appeals for the District of Columbia, the clear rule had been that delegate selection claims were justiciable (and, usually, constitutional). *See Bode,* 452 F.2d at 1305; *National Democratic Party,* 447 F.2d at 1276–78; *cf. Brown v. O'Brien,* 469 F.2d 563, 569–70 (D.C.Cir.) (per curiam), *stay granted,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1, *vacated* 409 U.S. 816, 93 S.Ct. 67, 37 L.Ed.2d 72 (1972). These holdings, however, might now be questioned. In *Ripon Society, Inc. v. National Republican Party,* 525 F.2d 548 (D.C.Cir.1975), Judge Bazelon reconsidered the *Georgia* and *Bode* decisions and explicitly affirmed these decisions in their entirety. Judge Bazelon would have found unconstitutional the Party's rule concerning allocation of delegates. The Circuit Court *sua sponte* considered the case *en banc.* In the subsequently issued decision, the circuit court rejected Judge Bazelon's view, holding the rule constitutional. *Ripon Society, Inc.,* 525 F.2d 567. Ironically, the *en banc* decision pretermitted the issue of justiciability, noting that it was decided in *Georgia,* regarded as settled in *Bode,* and subjected to "grave doubts" in *O'Brien. Id.* at 577. The *en banc* court expressly declined to decide the issue, and yet then passed to the merits of the constitutional claim. At least three of the circuit judges would hold the claims nonjusticiable. *Id.* at 592–95 (Danaher, J.); *id.* at 602–04 (Tamm, J.); *id.* at 609–14 (Wilkey, J.). Judge Bazelon would find the claim justiciable. *Id.* at 617.

A decision from the United States Court of Appeals for the Eleventh Circuit, *Wymbs v. Republican State Executive Committee of Florida,* 719 F.2d 1072 (11th Cir.1983), *cert. denied,* 465 U.S. 1103, 104

S.Ct. 1600, 80 L.Ed.2d 131 (1984), has considered the issue of justiciability in an electoral context. The court held that Article III does not permit a federal court to reorder the manner in which the Florida Republican Party selects delegates to the Republican National Convention. The court found that the claim was non-justiciable for three reasons. First, in *Wymbs*, the National Republican Party had not been sued. This denied the Court the power to afford plaintiffs effective relief. Second, the first amendment associational freedoms possessed by political parties limited the lower court's ability to meddle in the party's internal affairs. Last, enforcement of the one Republican, one vote rule which was sought by plaintiff posed insurmountable practical and legal problems for the court. *Id.* at 1086. The Eleventh Circuit in reaching its decision distinguished the *Bode* and *Georgia* decisions in which challenges were made to the national selection rules, and the national party had been joined as a defendant.

Against this background of court decisions, the Court now turns to an evaluation of whether Bachur's claim is justiciable. It is initially vital to recognize that Bachur's claim (or one similar to it) has not been previously presented, and the decisions cited above are hardly controlling. While the Court in *O'Brien* concededly expressed "grave doubts" about court intervention in this process, it recognized the possibility that injury could arise from invidious discrimination based on race in the delegate selection process which could be redressed in the courts. 409 U.S. at 4 n. 1, 92 S.Ct. at 2720 n. 1; *see also National Democratic Party*, 447 F.2d at 1278 n. 13 (any delegate allocation formula found to constitute invidious discrimination in terms of race, religion, sex, or economic status would be subject to judicial invalidation). Moreover, the disclaimer in *Cousins, supra* p. 766, that the question was not being decided that day does not fairly mean that the claim either is or is not justiciable; no inference is properly drawn from the Court's silence in that regard.

At issue here is discrimination based on gender and an alleged interference with the fundamental right to vote. Sex-based classifications ordinarily receive careful scrutiny by courts. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Only a compelling state interest permits an interference with the right to vote. *See infra* Section IV. The balance must be struck between a Party's rights independently to mandate its rules and a voter's constitutionally-protected rights. The balance is not between a state's rights and a political party's first amendment right of association; that question has been decided on several occasions in favor of the party. *E.g. Tashjian*, 107 S.Ct. 544; *Cousins*, 419 U.S. 477, 95 S.Ct. 544; *Democratic Party of the United States*, 450 U.S. 107, 101 S.Ct. 1011. Worth recognizing is that claims made in deciding that balance apparently are justiciable.

The claim here asserts that the Party acted unconstitutionally; whereas, in *Cousins* no allegation was even raised that the party rule was unconstitutional. All relevant defendants have been joined in the suit, so that the claim can be determined and, if appropriate, relief can issue. *But cf. Wymbs*, 719 F.2d 1072. The Convention itself will not be able to resolve this dispute; in fact, delegates to the 1980 Democratic National Convention passed a resolution requiring that all future conventions have equal numbers of male and female delegates, and embodied this resolution in the Party Charter. Furthermore, unlike in *Wymbs* where tailoring the remedy posed intractable problems, here the proposed injunction can provide effective relief for Bachur.

If the Democratic party passed a delegate selection rule, to be implemented by states in election primaries, which restricted voters in selecting black candidates as delegates, at this stage of our constitutional jurisprudence such a rule would most certainly be reviewed by a court (and probably struck down as unconstitutional). Indeed, it is certainly the function of courts to review, and render unconstitutional, a ballot which indicates the race of the candidate at all. *See Anderson v. Martin*, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430

(1964). The Supreme Court hinted as much with regard to justiciability in the delegate selection context in *O'Brien.*

If the same rule operates against women, the Court is confident that this rule too would be justiciable. Whether or not such a rule is constitutional may depend on the particular facts presented.

Finally, one considers the situation posed by Bachur. In essence, he regards the Equal Division Rule, as implemented in Maryland, as unconstitutional because he cannot vote for the eight candidates of his choice, regardless of gender. He alleges that this Rule infringes his right to vote by expressly indicating the gender of the candidate on the ballot and by restricting how his vote may be cast. This constitutional claim also must be deemed justiciable.

Therefore, the Court is satisfied that it must consider the merits of the constitutional claim presented by Bachur.

### IV

Bachur contends that the Equal Division Rule, first generally and then particularly as applied in Maryland, is unconstitutional because it infringes his fundamental right to vote and violates the equal protection clause of the Fourteenth Amendment.[10] The Court will treat each argument separately.

The underpinnings in the Constitution to a citizen's fundamental right to vote can be found in several provisions. Although courts often recognize the right without discussion of its source, it is appropriate in this case to engage in a brief discussion. Article I, section 2, clause 1 of the Constitution provides:

> The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for

Electors of the most numerous Branch of the State Legislature.

This language secures a right established and guaranteed by Constitution for the people to choose. *See Classic,* 313 U.S. at 314, 61 S.Ct. at 1037. The Seventeenth Amendment employs virtually identical language to delineate the class of persons eligible to vote in elections for United States Senator. *Republican Party of the State of Connecticut v. Tashjian,* 599 F.Supp. 1228, 1232 n. 1 (D.Conn.1984), *aff'd,* 770 F.2d 265 (2d Cir.1985), *aff'd,* — U.S. —, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). States are given, and in fact exercise, wide discretion in formulating a system to exercise this choice. *Classic,* 313 U.S. at 311, 61 S.Ct. at 1035. The Nineteenth Amendment, another source of the right to vote, provides in part that "[t]he right of citizens of the United States *to* vote shall not be denied or abridged by the United States or by any State on account of sex." The Fifteenth Amendment also addresses the right to vote as it forbids the denial or abridgment of that right on the basis of race. Courts have used any and all of these constitutional provisions in locating the source of the right to vote. Although none of these provisions confers a right to vote, as such, the Constitution itself has been construed to guarantee to every citizen the right to participate in the electoral process once a State has chosen to select its public officials by popular vote. *Duncan v. Poythress,* 515 F.Supp. 327, 336 (N.D.Ga.), *aff'd,* 657 F.2d 691 (5th Cir. 1981), *cert. granted,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647, *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982).

There can be little doubt at this stage of our constitutional jurisprudence that the right to vote in elections for national office is a fundamental one: "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and

---

**10.** Bachur has also argued that the Equal Division Rule, as implemented in Maryland, violates the Maryland Equal Rights Amendment. Article 46 of the Maryland Declaration of Rights, part of the State Constitution, provides: "Equality of rights under law shall not be abridged or

denied because of sex." In light of determinations made with respect to plaintiff's federal constitutional claims, this Court does not decide whether the Equal Division Rule violates the Maryland Equal Rights Amendment.

any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964); *Moore*, 394 U.S. at 818, 89 S.Ct. at 1495. A law which denies this right deprives a voter of "a fundamental political right, ... preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886); *Reynolds*, 377 U.S. at 562, 84 S.Ct. at 1381. Decision after decision by the Court holds that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) (citing cases). The right is protected by both the due process and equal protection clauses. *Duncan*, 515 F.Supp. at 336.

A citizen's fundamental right to vote extends as well to voting in a primary election. *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir.1978). As stated in *Classic:* "Interference with the right to vote in the Congressional primary ... is thus, as a matter of law and in fact, an interference with the effective choice of the voters at the only stage of the election procedure when their choice is of significance." 313 U.S. at 314, 61 S.Ct. at 1037. *Classic* explicitly secures this right for congressional elections. *Id.* at 314, 320, 61 S.Ct. at 1037, 1040. Moreover, the right is secured against the actions of individuals as well as states, *id.* at 315, 61 S.Ct. at 1037, and no state action thus is required.

■ Political parties have been held subject to the Constitution in the primary context, even when the primary is unregulated by the State. *Terry*, 345 U.S. 461, 73 S.Ct. at 809. *A fortiori*, the fundamental right to vote exists at the primary election level for delegate selection where the primary *is* being regulated by the State.

■ Because of the importance of the right to vote, "any alleged infringement ... must be carefully and meticulously scrutinized." *Hendon v. North Carolina State Board of Elections*, 710 F.2d 177, 180 (4th Cir.1983), *quoting Reynolds*, 377 U.S. at 562, 84 S.Ct. at 1381. Laws that place conditions other than residence, age, and citizenship on the right of franchise must promote a compelling state interest. *Hill v. Stone*, 421 U.S. 289, 295, 95 S.Ct. 1637, 1642, 44 L.Ed.2d 172 (1975); *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 626–30, 89 S.Ct. 1886, 1889–91, 23 L.Ed.2d 583 (1969); *see Dunn*, 405 U.S. at 336–37, 92 S.Ct. at 999–1000; *Bullock*, 405 U.S. at 144, 92 S.Ct. at 856 (where law has real, appreciable impact on exercise of franchise and on voters, it must be closely scrutinized and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster). The standard of review is encapsulated in the familiar phrase "strict scrutiny." *See* Note, *Affirmative Action, supra*, at 329.

Bachur presents a new variation in this case: does the fundamental right to vote exist when voters select candidates for delegate to a national party convention? If such a right does exist, the Court must then analyze whether the right was impermissibly infringed upon by restrictions imposed on the voter by the defendants.

■ We begin with the well-accepted proposition that the protected right to vote exists when one directly elects a candidate. This Court now determines and holds that there is no constitutionally significant difference when a voter directly elects a candidate and when a voter selects a candidate for delegate. The former is the election of a public official and triggers the fundamental right; the latter involves an "integral step" in the election of a public official and is also safeguarded by the Constitution. *See Classic*, 313 U.S. at 318–19, 61 S.Ct. at 1039; *Moore*, 394 U.S. at 818, 89 S.Ct. at 1495 (all procedures that are an integral part of election process must pass muster against charge of infringement of right to vote).

To appreciate the significance of the vote for candidate for delegate requires an understanding of the role of delegates at national party conventions and of the conventions themselves. As the Court has

noted with regard to the "special function" of delegates:

> Delegates perform a task of supreme importance to every citizen of the Nation regardless of their State of residence. The vital business of the Convention is the nomination of the Party's candidates for the offices of President and Vice President of the United States.... The Convention serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State.

*Cousins,* 419 U.S. at 489–90, 95 S.Ct. at 548–49. Delegates are directly representative of the people who elect them. They select the presidential nominee by voting for the candidate to whom they pledged themselves at the primary election stage (or for their independent choice if they are uncommitted) and the vice-presidential nominee recommended in the usual situation by the presidential candidate. They debate and adopt the party platform. While the Convention is in session, the delegates are indeed *the party;* delegates adopt party rules and amend the party constitution. This is particularly significant with regard to the Equal Division Rule which was added to the Democratic Party Charter at the 1980 Convention by all delegates. Delegates also perform a media function as the national political parties vie with each other in an attempt to attract voters. In light of the role played by delegates, this Court is certain that the "integral step" described in *Classic* occurs when Bachur votes for candidates for delegate who will ultimately represent his views at the party's national convention.

■ Having established that there exists a fundamental right to vote in the selection of delegates for national party conventions, the question becomes whether the right to vote was impermissibly infringed upon by restrictions imposed on Bachur by the defendants. Rule 6(C), as implemented by the Maryland Democratic Party, clearly restricted Bachur's right to vote. It required him to vote for no more than four men and no more than four women in allocating his eight votes. In a slightly differ-

ent context, namely, a challenge to a state's ballot access requirements, the Court has noted that

> [i]n passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze,* 460 U.S. at 789, 103 S.Ct. at 1570. The critical issue here is the *burden* being imposed on plaintiff.

Exhaustive research reveals no other case in which a State or political party has directed a voter to so divide his ballot. However, the Court found a statute to be unconstitutional in *Anderson v. Martin,* when the statute required the race of each candidate for school board to be printed on the ballot adjacent to the candidate's name. 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964). The rationale of *Anderson v. Martin* applies here, where the ballot separately identified and classified men and women. Only a compelling interest set forth by the defendants is sufficient to overcome this infringement. *See Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979).

■ The State Administrator offers no compelling interest for the restriction. The State maintains that it was required by state statutory and federal decisional law to follow the dictates of the national and state parties. When the Maryland Democratic Party ordered the separation by gender on the ballot, the State believed it was required to comply with the mandate. The State has maintained that its hands were tied during the election process. Accordingly, this defendant offers no compelling interest.

The Maryland Democratic Party is no different. It had the discretion to determine how the Equal Division Rule would be implemented in Maryland and, after hold-

ing public hearings throughout the State, it decided to hold a primary election. The state party was bound to follow the National party's mandate and to send equal numbers of female and male delegates to the Convention. The sanction for non-compliance would have been non-participation by Maryland delegates in the National Convention. The State party's hands were tied as were the State Administrator's once the party opted to hold a primary. The State party expresses no compelling reason for its abridgment of plaintiff's right to vote independent of an argument raised by the National party, to which the Court now turns.

The Democratic National Party mandated the Equal Division Rule. Although this defendant has focused directly on plaintiff's equal protection claim and does not separately articulate a compelling interest sufficient to outweigh plaintiff's right to vote, the primary argument made in connection with the equal protection claim applies in this context as well.

The National Party could argue that its first amendment associational rights allow it to infringe the voter's constitutional rights. The party's first amendment rights clearly outweigh state statutes to the contrary. *See Tashjian,* 107 S.Ct. 544; *Democratic Party of the United States,* 450 U.S. 107, 101 S.Ct. 1011; *Cousins,* 419 U.S. 477, 95 S.Ct. 545. But courts have stated or implied on numerous occasions that the balancing process is different when a constitutional challenge is made to party policy. *See O'Brien,* 409 U.S. 1, 92 S.Ct. 2718; *Seergy,* 459 F.2d 305; *National Democratic Party,* 447 F.2d 1271. In the White Primary Cases, the Court held that the fifteenth amendment right to vote free from any racial discrimination outweighed the right of free association. *See, e.g., Terry,* 345 U.S. 461, 73 S.Ct. 809. A party's first amendment rights will not necessarily save the policy from scrutiny and constitutional invalidation; the focus instead is on the compelling interests proffered as justifications for the intrusions on the right to vote. Moreover, if there exists a federal constitutional violation, the strong endorsement of the party's first

amendment associational rights may well not apply. *See Cousins,* 419 U.S. 477, 95 S.Ct. 541.

The primary interest set forth by the National Party as a justification is that the Equal Division Rule attempts to remedy past discrimination against women. The record indicates that, despite the extension of the franchise to women in 1920, men continued to dominate the political process. Throughout the 1960's, women rarely were nominated by political parties to run for office and rarely were involved at the decision-making level within the parties. *See generally,* Abzug, *supra,* at 766–768. Beginning in 1968 and continuing through 1976, the leadership of the Democratic Party appointed commissions to study the problem of underrepresentation of women. The commissions focused in part on the lack of women as delegates at national party conventions and began formulating steps to be taken to remedy past discrimination against women in the political process.

Women constituted 11 percent of delegates to the 1960 Convention and 14 percent of delegates to the 1964 Convention. *Id.* at 767. The commission created after the 1968 Democratic Convention found:

> Women, who now comprise a majority of the voting age population in the United States, showed a dramatic increase in political awareness and activity during the 1960's. Like young people and blacks, however, they found delegate positions at the Democratic Convention to be among the political offices that remained beyond their reach. In the 1968 convention, women comprised only 13% of the voting delegates.

Mandate for Reform: A Report of the Commission on Party Structure and Delegate Selection to the Democratic National Committee 28–29 (1970). Affirmative action programs were adopted for the 1972 Convention and the percentage of women delegates increased to 40 percent. Abzug, *supra,* at 767. In 1976, however, the percentage dropped to 33 percent. Thereafter, the Party adopted the Equal Division Rule for the selection of delegates to the

1980 Convention, and 49 percent of the delegates at that Convention were women. The 1980 Convention delegates also added the Equal Division Rule to the Party Charter, thereby insuring that all future conventions have equal numbers of male and female delegates. The Party made this decision after twelve years of effort to remedy a perceived problem of discrimination against women.

Clearly, the problem of under-representation of women as delegates to the National Convention constitutes an interest to be weighed. The Party certainly can choose, if it sees fit, to involve more women in the electoral process and to alter the political dynamic by which women have been effectively excluded. The Party can choose to accomplish this end for whatever purpose it sees fit. The most obvious purpose would be to try to convince women to vote for the party's candidate on the theory that other women are actively involved in the candidate selection process. The Party noted that, at a media event such as the Convention, it wanted the viewing audience to see as many groups as possible in its constituency, obviously including women.

But the interest is not compelling enough to override the voter's fundamental right. As at least one court has noted: "The strict scrutiny test requires that the challenged statute be narrowly drawn to provide the least restrictive means of furthering a compelling state interest." *Dart v. Brown,* 717 F.2d at 1498. The test has been described as " 'strict' in theory and 'fatal' in fact." *Id., quoting Arceneaux v. Treen,* 671 F.2d 128, 131 (5th Cir.1982). Application of the test has been reserved for matters involving race, religion, national origin, and characterizations impinging on fundamental rights, including the right to vote. *Id.* There certainly exist less restrictive means to accomplish the Party's goal of remedying past discrimination—for example, the Party can directly appoint all delegates to the Convention, the Party can decree that delegates will be selected in caucuses, or the Party can mandate that no primaries be held. In each situation, the voter's fundamental right to vote will not be implicated. Once a primary is held,

however, the voter's interest must be factored and weighed.

As implemented in Maryland, the Equal Division Rule is unconstitutional. It unduly infringes plaintiff's fundamental right to vote by instructing a voter how to allocate his votes. Just as a state can no longer encourage voters to cast ballots on the basis of race, *see Anderson v. Martin,* 375 U.S. 399, 84 S.Ct. 454, so, too, a state cannot explicitly encourage and require voting on the basis of gender. The only justification put forth by defendants is insufficient to support this intrusion.

Plaintiff also maintains that Rule 6(C) violates the Equal Protection Clause of the Fourteenth Amendment because it classifies candidates on the basis of gender. State action certainly is required here, and the Court has previously found that state action does exist. *See supra,* section III C.

In a most recent discussion of the Equal Protection Clause, the Court stated:

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.... [C]ourts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection. The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest....

The general rule gives way, however, when a statute classifies by race, alienage, or national origin.... [T]hese laws are subject to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest....

Legislative classifications based on gender also call for a heightened standard of review.... A gender classification fails unless it is substantially related to a sufficiently important governmental interest.

786

*City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

 Bachur's claim as a voter does not raise an equal protection claim. He, as a voter, has been treated no differently than any other voter. The Equal Division Rule, as applied, does not treat similarly situated persons differently. All voters in the Third Congressional District in Maryland were subject to the same restriction. All such voters had to cast their votes for a maximum of four men and four women. Although other voters in other Congressional Districts in Maryland were treated differently, electing different numbers of male and female delegates based on the flip of a coin, Bachur lacks standing to prosecute these claims. Therefore, insofar as Bachur raises an equal protection claim as a voter, his claim fails because he has not been treated differently.

 Bachur does have standing, however, to raise an equal protection claim on behalf of candidates for delegate. *See supra,* section III A. In the Third District, candidates were classified and treated differently based on their gender. The ballot separately listed men and women, and instructed voters to select no more than four men and no more than four women. This occurred even as forty-three men and thirty-four women ran as candidates for the eight delegate positions. The Equal Division Rule, as implemented in Maryland, was designed to select equal numbers of men and women delegates. The means chosen was the gender classification.

Numerous Supreme Court decisions, most notably *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) and *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, indicate that the classification is unconstitutional unless substantially related to a sufficiently important interest. *See also City of Cleburne,* 473 U.S. 432, 105 S.Ct. 3249. Resolving Bachur's claim under the fourteenth amendment presents a closer question than did his claim based on the fundamental right to vote.

Nevertheless, the only interest proffered by the defendants has been stated above; namely, the party attempts to remedy past discrimination against women, particularly at national conventions, by increasing the number of women delegates. The Court finds that the gender classification on the ballot is not substantially related to a sufficiently important interest. Therefore, the Equal Division Rule also violates the equal protection clause of the Fourteenth Amendment.

CONCLUSION

The Court finds that the Democratic National Party's Equal Division Rule, as implemented in Maryland by the Maryland Democratic Party and the State of Maryland for the 1984 Democratic Primary, is unconstitutional. Counsel for plaintiff shall submit an appropriate Order to the Court in conformity with this opinion within ten days.